**Winthrop J. ALLEGAERT, as Trustee of duPont Walston Incorporated, Plaintiff-Appellant,**

v.

**H. Ross PEROT et al., Defendants-Appellees,**

**and**

**Douglas E. DeTata et al., Defendants.**

**No. 257, Docket 76–7235.**

United States Court of Appeals, Second Circuit.

Argued Dec. 2, 1976.

Decided Jan. 25, 1977.

George A. Davidson, New York City (Hughes Hubbard & Reed; Robert J. Sisk, Karen G. Lind, New York City, on the brief), for plaintiff-appellant.

Richard P. Shlakman, Washington, D.C. (Leva, Hawes, Symington, Martin & Oppenheimer, Andrew D. Weissman, Washington, D.C., on the brief), for defendant-appellees E. D. Systems Corp., Electronic Data Systems Corp.

Samuel M. Koenigsberg, New York City (Guggenheimer & Untermyer, Harold Baer, Jr., New York City, on the brief); for defendants-appellees Daniel J. Cullen, William D. Fleming, Charles W. Cox, George T. Thomson.

Russell E. Brooks, New York City (Milbank, Tweed, Hadley & McCloy, Stephen E. Kowitt, New York City, on the brief), for defendant-appellee New York Stock Exchange, Inc.

Weil, Gotshal & Manges, Peter Gruenberger, James W. Quinn, Henry J. Tashman, New York City, for defendants-appellees H. Ross Perot, Milledge A. Hart, III, Morton H. Meyerson, PHM & Co., duPont Glore Forgan Inc.

Luce Hennessy Smith & Castle, Thomas W. Luce, III, Robert Powell, Dallas, Tex., for defendants-appellants William K. Gayden, Marvin L. Stauffer, Charleston Investment Co., Margot Perot.

Before MOORE, FEINBERG and GURFEIN, Circuit Judges.

FEINBERG, Circuit Judge:

This case raises significant questions regarding the interplay between the powers of a bankruptcy trustee and the policy of United States Arbitration Act, 9 U.S.C. §§ 1–14. Winthrop J. Allegaert, bankruptcy trustee of duPont Walston Incorporated (Walston), appeals from two orders of the United States District Court for the Southern District of New York, Whitman Knapp, J., which stay the trustee's action against 20 defendants and, in effect, require the trustee to arbitrate his claims. The trustee's complaint states various causes of action under federal and state law arising out of the realignment in July 1973, at the alleged instance of H. Ross Perot, of the businesses of Walston and duPont Glore Forgan Incorporated (DGF Inc.), both then securities brokerage firms and members of the New York Stock Exchange, Inc. (NYSE) and the American Stock Exchange, Inc. (Amex). Defendants in the trustee's suit are Perot, DGF Inc., Electronic Data Systems Corporation (EDS), which is controlled by Perot, the NYSE, several Perot associates and investment vehicles, and the Walston directors who voted in favor of the realignment of Walston and DGF Inc. For reasons set forth below, we conclude that the district court erred in staying all causes of action in the trustee's suit. Therefore, we reverse the orders of the district court, vacate the stay and allow the trustee's suit to continue at least with respect to most of the causes of action stated in his complaint.

I

*Background*

To clarify the issues on appeal, it is necessary to state in some detail the facts as claimed by the trustee in his complaint or as they appear in the limited record before us. The trustee alleges a complex scheme to defraud Walston, under which defendants both siphoned off Walston's assets to DGF Inc. and also imposed the latter's liabilities on Walston. According to the trustee, Perot was trying to get out of a disastrous involvement with the brokerage business and was the mastermind behind the scheme. Perot is the founder and controlling stockholder of EDS, which operates data processing systems for corporate customers. In the early 1970's, Perot invested about $70 million in, and took control of, the brokerage firm later known as DGF Inc. Perot had borrowed most of the money and had pledged EDS stock as collateral, but the value of that stock depended on continued income from EDS's contract with DGF Inc. By spring 1973, however, DGF Inc. was in bad shape; insufficient capital had brought it to the verge of liquidation. That event would have threatened Perot's

entire financial empire and to avoid it, Perot came up with the scheme (the Perot Plan) that involved Walston, in which Perot was a minority investor.

The trustee describes the Perot Plan as a series of unusual transactions by which Walston would assume all front office operations of the two firms and DGF Inc. would assume back office operations. All of the liabilities of DGF Inc.'s failing branch office system would be shifted to Walston, including lease liabilities on many offices, some already closed. Walston would pay DGF Inc.'s expenses and make a $3 million advance on them. In addition, Perot would exchange his non-voting preferred stock in Walston for a new series of preferred stock with more voting rights than all of Walston's common stock. Thus, the Plan would protect DGF Inc.'s capital against future loss, while Walston would assume immense liabilities.

According to the trustee, the Perot Plan was railroaded through the Walston Board of Directors in July 1973 by a vote of 10–9, after insufficient notice of the lengthy and complex realignment agreements and at a Sunday Board meeting that lasted until the early hours of Monday morning, during which the Perot representatives made numerous misrepresentations and omissions of material information and promises of improper benefits. The trustee also alleges and the NYSE, because of its own interest in preserving the capital of DGF Inc.,[1] concealed the conclusions of its own staff that Walston's capital would be completely depleted in eight months if the Perot Plan were adopted. After the Plan went into effect, Walston allegedly lost over $30 million and was forced to liquidate its business.

*Court Proceedings*

In March 1974, Walston filed a petition in the United States District Court for the Southern District of New York under Chapter XI of the Bankruptcy Act. Two months later, Bankruptcy Judge Roy Babitt adjudicated Walston a bankrupt and Allegaert was appointed trustee. The trustee asserts that before the realignment agreements went into effect, Walston had an equity of more than $30 million. At the time of bankruptcy it apparently had assets of less than $2 million and creditors' claims of over $75 million.

Based on this sorry picture,[2] the trustee brought suit in July 1975 against defendants, alleging violations of the Securities Act of 1933, the Securities Exchange Act of 1934, the Bankruptcy Act, the Delaware General Corporation Law, the New York Business Corporation Law, the New York General Business Law and the common law. In October 1975, most of the defendants moved under the United States Arbitration Act to stay the action pending arbitration of the claims alleged in the complaint.[3] These defendants relied upon three arbitration clauses, each of which was allegedly binding upon Walston and, therefore, upon its trustee. The first two were contained in the Constitutions of the NYSE and the Amex and required arbitration of all controversies between exchange members and all controversies between a member and a nonmember who seeks arbitration of any claim arising out of the member's business.[4]

---

1. According to the trustee, the NYSE was interested in saving DGF Inc. because its liquidation would have made the Exchange Special Trust Fund liable to Perot on a $15 million note, and the Fund lacked funds sufficient to cover that amount.

2. Appellees dispute the accuracy of the trustee's "facts," pointing out that many of them are mere allegations in a complaint and have not been proved. We, of course, express no view as to whether the trustee's allegations, particularly those charging fraud and wrongdoing, are correct.

3. The nonmoving defendants are four former directors of Walston: Douglas E. DeTata, John J. Doughty, D. Tipp Cullen and Allan Blair.

4. Article VIII, section 1 of the New York Stock Exchange constitution provides:

Any controversy between parties who are members, allied members, member firms or member corporations shall, at the instance of any such party, and any controversy between a non-member and a member or allied member or member firm or member corporation arising out of the business of such member, allied member, member firm or member cor-

The third arbitration clause appeared in one of the realignment agreements and covered all disputes arising out of those agreements.[5] Although the NYSE is not a party to the agreements to arbitrate, it moved to stay the trustee's action on the ground that the arbitration between the trustee and the arbitrating defendants would resolve many of the issues affecting the NYSE and may render moot the action against it.

In April 1976, Judge Knapp granted the motion to stay. In a memorandum opinion,[6] he reasoned that the arbitration clauses were enforceable against the trustee and there was no persuasive reason not to do so. Although the NYSE could not compel arbitration, its arguments as to why the action against it should also be stayed were persuasive. This appeal followed.

## II

The trustee's principal contentions before us are that he is not the same entity as the bankrupt, Walston, and is therefore not bound by the latter's executory arbitration contracts and that he cannot be compelled, in any event, to arbitrate the claims arising under the Bankruptcy Act and the securities laws. The trustee also claims that the

arbitration agreements would not have been enforceable even against Walston. Finally, the trustee argues that even if he must arbitrate his claims against some defendants, the judge should not have stayed the action against the NYSE, which concededly has no right to compel arbitration of the trustee's dispute with it. Defendants respond that a bankruptcy trustee enjoys no special status which exempts him from the effect of arbitration clauses contained in nonexecutory contracts of the bankrupt, that the Bankruptcy Act and securities law claims are arbitrable, that the arbitration agreements were binding on Walston and the trustee, and that the district court acted properly in staying the action pending arbitration. Finally, defendants say that even if some of the trustee's claims are not arbitrable, his action upon them should be stayed pending arbitration of all the other issues.

These arguments obviously raise a number of substantial questions,[7] but we do not find it necessary to consider most of them. The trustee's position that he and the bankrupt are different legal entitles is certainly correct. We said precisely that in *Shopmen's Local 455 v. Kevin Steel Products, Inc.*, 519 F.2d 698, 704 (2d Cir. 1975),

---

poration, or the dissolution of a member firm or member corporation, shall, at the instance of such non-member, be submitted for arbitration, in accordance with the provisions of the Constitution and the rules of the Board of Directors.
Article VIII, section 1 of the American Stock Exchange Constitution provides:
  Members, member firms, partners of member firms, member corporations and officers of member corporations shall arbitrate all controversies arising in connection with their business between or among themselves or between them and their customers as required by any customer's agreement, or in the absence of a written agreement, if the customer chooses to arbitrate.

5.  Article 10.11 of the Master Agreement provides:
  Arbitration. duPont and Walston agreed to submit any dispute arising under this Agreement and the Ancillary Agreements or with respect to any of the transactions contemplated thereby to arbitration, in accordance with the provisions of the Constitution of the NYSE and the rules of the NYSE,

except that disputes under the Clearing Agreement relating to transactions executed on an exchange other than on the NYSE, which has in its constitution or rules provisions compelling arbitration among members thereof, shall be submitted to arbitration in accordance with the Constitution and Rules of such other exchange.

6.  This was followed by a formal order and a brief supplemental memorandum.

7.  For example, if the parties have terminated or have fully performed under a contract, but have not arbitrated their dispute as the contract's arbitration clause provides, is the arbitration agreement an executory contract within the meaning of section 70b of the Bankruptcy Act and, therefore, rejectable by the trustee? See Countryman, Executory Contracts in Bankruptcy, Parts I and II, 57 Minn.L.Rev. 439 (1973), 58 Minn.L.Rev. 479 (1974). If not, are there instances in which a bankruptcy trustee is bound by an arbitration clause in an executed contract of the bankrupt?

where we pointed out that a bankruptcy trustee is "[a] new entity . . . with its own rights and duties, subject to the supervision of the bankruptcy court." We again emphasized the point the following month in *Brotherhood of Railway Clerks v. REA Express, Inc.*, 523 F.2d 164, 167 (2d Cir.), cert. denied, 423 U.S. 1017, 1073, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975, 1976). We recognize that the existence of this distinction between the bankrupt and the trustee is not necessarily dispositive. The significance of the distinction hinges on the facts of each situation.[7a] But the trustee's complaint shows the lack of identity to be particularly important here. Seven counts state claims under various sections of the Bankruptcy Act,[8] and charge that the realignment scheme resulted in fraudulent, preferential or post-bankruptcy transfers of Walston's assets to the Perot interests, which the Act allows the trustee to set aside or recover for the benefit of Walston's creditors. These are statutory causes of action belonging to the trustee, not to the bankrupt, and the trustee asserts them for the benefit of the bankrupt's creditors, whose rights the trustee enforces. For example, if there had been no federal bankruptcy proceeding and if a creditor had independently asserted a claim under N.Y. Debt & Cred. Law § 278 to set aside a fraudulent transfer of assets, the creditor would not have been subject to any arbitration agreement. Since the trustee stands in the creditor's shoes for this purpose, he too should not be compelled to arbitrate these claims. See also *Johnson v. England*, 356 F.2d 44, 51 (9th Cir.), cert. denied, 384 U.S.

961, 86 S.Ct. 1587, 16 L.Ed.2d 673 (1966). Cf. *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith*, 410 F.2d 135 (7th Cir. 1969).

■ Moreover, seven counts in the complaint allege, in effect, violations of various anti-fraud provisions of the securities laws.[9] In the context of this case neither these claims nor the Bankruptcy Act claims should be arbitrable. In *American Safety Equipment Corp. v. J. P. Maguire & Co.*, 391 F.2d 821, 825 (2d Cir. 1968), we analyzed at some length the considerations affecting whether a claim was "of a character inappropriate for enforcement by arbitration."[10] In holding that we would not there compel arbitration of private antitrust claims on the basis of an arbitration agreement made before the claim arose, we examined, among other things, the public interest in the dispute, the degree to which the nature of the evidence made the judicial forum preferable to arbitration and the extent to which the agreement to arbitrate was a product of free choice. At least the first two of these criteria cut sharply against arbitrability here. This is no mere dispute between private parties with public interest overtones, as in *American Safety*. We have here a claim by a trustee, appointed under the authority of a federal bankruptcy court, in connection with one of the most celebrated brokerage house failures in the history of Wall Street.[11] And the Bankruptcy Act claims are asserted on behalf of many hundreds of creditors. Unlike an operating business, the trustee employs no witnesses with knowledge of the relevant facts, and he has almost none of the

---

**7a.** For example, when the trustee affirms an executory contract under section 70b of the Bankruptcy Act, the difference is minimized; to obtain his rights under the contract the trustee will have to accept the entire contract, including an arbitration clause if the contract contains one. *Truck Drivers Local 807 v. Bohack Corp.*, 541 F.2d 312 (2d Cir. 1976).

**8.** Sections 60, 67 and 70.

**9.** Three counts allege violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5; one count rests on Section 29(b) of the Exchange Act to void the realignment contract; one count charges violations of Section 17(a) of

the Securities Act of 1933; one count is grounded in Section 12(2) of the Securities Act; and one count seeks to impose liability on controlling persons under Section 15 of the Securities Act and Section 20(a) of the Exchange Act.

**10.** The quotation was from *Wilko v. Swan*, 201 F.2d 439, 444 (2d Cir.), rev'd, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953).

**11.** See C. Welles, *The Last Days of the Club* 258–66 (1975). See also Rustin, *Who Bailed Out Whom When Walston Joined With duPont Glore Forgan?*, Wall St. J., August 13, 1973, at 1.

relevant records. Under the Perot Plan, all "back-office" functions—accounting, record keeping, etc.—were performed by DGF Inc., which is now also defunct. Yet the availability of discovery in arbitration is uncertain.

■ The presence of the securities law claims further supports the need for a judicial tribunal here. In *Greater Continental Corp. v. Schechter*, 422 F.2d 1100, 1103 (2d Cir. 1970), we noted the "strong federal policy in favor of determining stock fraud questions in the federal courts" and observed:

This type of question concerning fraud within the meaning of Rule 10b–5 is properly litigated in the courts where a complete record is kept of the proceedings and findings and conclusions are made. It was for that reason that in both the 1933 and 1934 securities acts Congress provided that questions arising under those acts were not to be determined in arbitration proceedings (but rather in the courts) even if the contract between the parties contained an arbitration provision. Section 14 of the Securities Act of 1933, 15 U.S.C. § 77a, see *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953); section 29(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc . . . .

Id. It is true that we have recognized a limited exception to the policy behind *Wilko v. Swan* by allowing arbitration of disputes affecting member firms of stock exchanges. See e. g., *Coenen v. R. W. Presspich & Co.*, 453 F.2d 1209 (2d Cir. 1972); *Axelrod & Co. v. Kordich, Victor & Neufeld*, 451 F.2d 838 (2d Cir. 1971). In *Coenen*, plaintiff NYSE member was required to arbitrate his claim against another member for conspiring to force plaintiff to sell stock at a price held unconscionably low by refusing to allow plaintiff to transfer the shares free of a legend stating that registration was required. In *Axelrod*, a NYSE member firm unsuccessfully resisted arbitration of a claim against it by a nonmember securities firm that charged breach of a stock purchase contract. We held that in these intramural situations the Congressional intent to let the stock exchanges regulate themselves, embodied in section 28(b) of the Exchange Act,[12] creates an exception to the *Wilko* rule.[13] But the exceptions to the general rule for disputes between brokerage houses over industry matters make sense only when limited to their facts. A claim of wholesale fraud of institutional dimension, especially when raised by a trustee, does not fall within the rationale of the exception. This is more than a mere internal brokerage industry squabble; it raises broad questions of policy which ordinarily should be handled by the judiciary for reasons similar to those why an antitrust claim should not ordinarily be arbitrable. See *American Safety Equipment Corp. v. J. P. Maguire & Co.*, 391 F.2d 821, 825–29 (2d Cir. 1968). Cf. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973).

Citing *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510 & n.4, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), and *Erving v. Virginia Squires Basketball Club*, 468 F.2d 1064, 1067–68 (2d Cir. 1972), appellees argue that the trustee's "shrill cry against arbitration" invites us to return to the discredited notions of a bygone era when courts resisted arbitration to the bitter end. We agree that such judicial hostility to the arbitration process is, and should remain, a thing of the past. We accept without reluctance the "federal policy favoring arbitration," *Carcich v. Rederi a/b Nordie*, 389 F.2d 692, 696 (2d Cir. 1968), reflected in the United States Arbitration Act. But such acceptance does not decide this case, which involves the

---

12. 15 U.S.C. § 78bb provides, in pertinent part: (b) nothing in this chapter shall be construed to modify existing law (1) with regard to the binding effect on any member of an exchange of any action taken by the authorities of such exchange to settle disputes between its members. . . .

13. In *Coenen*, we also stressed that the agreement to arbitrate was made after the cause of action arose, thus distinguishing *American Safety*, and was therefore, "in effect an agreement to settle the dispute." 453 F.2d at 1215.

**438**

equally significant policies reflected in the securities acts and the Bankruptcy Act. In such a situation, generalities must give way to careful analysis of the different, sometimes competing, public policy interests. Thus, none of the cases stressed so heavily by appellees controls the disposition here, since each depends on its own facts. In *Fallick v. Kehr,* 369 F.2d 899 (2d Cir. 1966), we allowed an arbitrator to decide in a dispute between private parties whether a debt had been discharged in a completed bankruptcy proceeding. We did so after careful consideration of all the factors involved, including Congressional lack of concern over use of a non-bankruptcy court forum to decide such issues.[14] In any event, we did not hold that Kehr could force Fallick's bankruptcy trustee to arbitrate that question. Similarly, in *Tobin v. Plein*, 301 F.2d 378 (2d Cir. 1962), and in *Truck Drivers Local 807 v. Bohack Corp.*, 541 F.2d 312 (2d Cir. 1976), we did not force arbitration upon an unwilling bankruptcy trustee and the trustee was not asserting the type of claims made here under the securities laws and the Bankruptcy Act. The latter is also true of *Schilling v. Canadian Foreign Steamship Co., Ltd.*, 190 F.Supp. 462 (S.D. N.Y.1961).

We conclude, therefore, that the trustee cannot be compelled to arbitrate his claims under the securities laws and the Bankruptcy Act. To that extent, the order of the district court staying the trustee's action was incorrect and should be reversed. The trustee should be allowed to pursue at least these causes of action immediately in the federal district court prior to any arbitration of the remaining claims. Cf. *American Safety*, supra, 391 F.2d at 828–29. Otherwise, the trustee's efforts to preserve the estate, of which this action is apparently the major asset, could be prejudiced by loss

of evidence or witnesses, and by increased administrative expenses. Our decision, of course, means the trustee's action against the NYSE should go forward as well since there would then be no sufficient basis for staying it.[15] Finally, since the Bankruptcy Act and securities law claims involve so many of the basic factual and legal issues underlying the trustee's remaining claims, resolution of the former may make it unnecessary or inappropriate to proceed with the latter in any forum. Under the circumstances, no arbitration should be permitted at this time.

Judgment reversed and case remanded for proceedings consistent with this opinion.[16]

**14.** We pointed out that, in order to avoid potential "abuse by unscrupulous creditors," Congress might want to amend the Bankruptcy Act. 369 F.2d at 905. Congress thereafter did so. 11 U.S.C. § 35(c) (1970).

**15.** The NYSE argues that the order of the district court as to it is not appealable and should not be considered by us. This is technically

true, but we note that in light of the result here, a refusal by the district court to reconsider and reverse its order would be an abuse of discretion.

**16.** On this disposition, we see no need to consider and resolve the other objections to arbitration raised by the trustee.