**CREATIVE SECURITIES CORP., et al., Plaintiffs,**

v.

**BEAR STEARNS & CO., et al., Defendants.**

**No. 87 Civ. 2188 (RJW).**

United States District Court, S.D. New York.

Oct. 13, 1987.

Charles J. Hecht, P.C., New York City, for plaintiffs; Charles J. Hecht and Jacob H. Zamansky, of counsel.

Parker Chapin Flattau & Klimpl, New York City, for Bear Stearns, defendants; Alvin M. Stein, Charles P. Greenman and Katherine C. Ash, of counsel.

Gibson, Dunn & Crutcher, New York City, for defendant Alan Abelson.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendants M.A. Berman Co. and Meyer Berman.

Scheffler Karlinsky & Stein, New York City, for defendants Starr Securities, Inc., Martin Vegh and Fagenson & Co., Inc.

## OPINION

ROBERT J. WARD, District Judge.

Defendants Bear, Stearns & Co., Bear, Stearns & Company, Bear, Stearns & Co. Inc., (collectively "Bear Stearns defendants"), the former general partners of Bear Sterns who were served with a summons and complaint in this action, ("Bear Sterns Partners"),[1] Richard Harriton ("Harriton"),

---

1. At this point in the proceedings, the Court expresses no opinion on the respective liability of either the general partners or the corporation for the alleged acts or omissions of the defendants. The Court, however, does note that the general rule is that they remain liable for all contracts made and debts incurred by them while they were doing business as partners, unless they are specifically released from liability. This is true even where there has been an assumption of the debts and obligations by the new corporation. *See* 8 Fletcher Cyc Corp

William Gangey ("Gangey"), and Joseph Thomas, Sr. ("Thomas"), filed this motion pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 3, 6, to compel arbitration of plaintiffs' claims and to stay this action in accordance with the Arbitration Procedures of the National Association of Securities Dealers, Inc. ("NASD"), or pursuant to various agreements to arbitrate between defendants and plaintiffs Creative Securities Corporation ("Creative"), Fred Mazzeo ("Mazzeo"), Charles J. Dedde, Jr. ("Dedde"), William J. Mayer, John H. Steinkampf, Jr., Arnold Kuppersmith, and Dr. Leonard Venezia (the "Customers").[2] For the reasons that follow, defendants' motion is granted in part and denied in part.

## BACKGROUND

Plaintiff Creative, a member of the National Association of Securities Dealers ("NASD"), acted as a market maker for various securities listed on the National Association of Securities Dealers Automated Quotation System ("NASDAQ") and in the "pink sheets" published by the National Quotation Bureau between 1982 and 1985. Creative's role as a market maker was to provide an organized market for securities it sponsored in which the securities could be readily purchased or sold. In its capacity as a market maker, Creative would at various times purchase or sell the securities it sponsored at a quoted ask or bid price.

In furtherance of its role, Creative entered into two contracts with Bear Stearns, another member of the NASD. On June 25, 1984, Bear Stearns and Creative entered into an Agreement for Securities Clearance Services ("Clearing Agreement") pursuant to which Bear Stearns performed various functions[3], including the maintenance of all pertinent books and records for Creative and Creative's customers. Creative subsequently introduced over 16,000 customers to Bear Stearns. Upon the introduction of a customer, Bear Stearns and the customer would enter into the Bear Stearns Customer Agreement ("Customer Agreement"). This document opened an account in the customer's name, and Bear Stearns would issue monthly statements and confirmations of the securities transactions. On July 6, 1984, Bear Stearns and Creative entered into an identical Customer Agreement under which the same services were provided for accounts held on Creative's own behalf.

In the action before this court, plaintiffs Creative, Mazzeo (its president and sole shareholder), Dedde (an employee of Creative), and four former Customers of Creative allege that Bear Stearns, Harriton (a managing director and general partner), Gangey and Thomas (both assistant directors), and other defendants not parties

§ 4019 (1982). For the purposes of this motion, the Court assumes that even if the general partners are non-signatories, they are bound by the arbitration provisions contained in the contracts. *See Ferreri v. First Options of Chicago, Inc.,* 623 F.Supp. 427, 435 n. 7 (E.D.Pa.1985).

**2.** Thus far, while all of the other Customer Agreements have been found, defendants have not been able to locate plaintiff Kuppersmith's Customer Agreement. The Court, however, is persuaded that, notwithstanding Kuppersmith's present protestations to the contrary, defendants followed their routine practice and Kuppersmith did enter into a Customer Agreement. The allegations in paragraphs 12 and 145 of the Complaint, that plaintiff was introduced by Creative to Bear Stearns and maintained a securities brokerage account pursuant to a Customer Agreement, constitutes a weighty admission. Moreover, under the Federal Arbitration Act, there need only be a written agreement to arbitrate. It need not be signed by the party to be charged. *See Fisser v. International Bank,* 282 F.2d 231, 233 (2d Cir.1960). Inasmuch as the context of the transactions between Kuppersmith and the defendants make it virtually inconceivable that a Customer Agreement was not signed with respect to Kuppersmith's account, the Court for the purposes of this motion finds that Kuppersmith is bound by the arbitration provisions of the Customer Agreement.

**3.** *See* Clearing Agreement, at ¶ 13 (listing the various functions provided by Bear Stearns). Among its functions, Bear Stearns was to monitor and require the customers to deliver securities that it sold, make prompt payments for securities purchased and other charges, and maintain money in their accounts as required by applicable federal regulations. Bear Stearns would also arrange extensions of credit, provide custody, safekeeping, and segregation of money and securities.

to this motion, conspired to fraudulently manipulate downward the price of the securities Creative sponsored to artificially created price levels.

The alleged conspiracy entered into by Bear Stearns and others was a device whereby certain defendants ("Short Sellers") would sell stock they did not own in anticipation that the price would decline. However, since the Short Sellers were required by the Exchange's rules to deliver the stocks they sold within a limited period of time, the usual practice was for the Short Sellers to borrow the stock from another broker. In this case Bear Stearns allegedly improperly loaned their customers' stock to the Short Sellers, thus converting the customers' securities for Bear Stearns' own use. In exchange, the Short Sellers deposited with the lender an amount of cash equivalent to the securities' market value. When the Short Sellers covered—bought the stock at the lower price—they returned the borrowed stock to Bear Stearns who repaid the sum on deposit and closed the transaction. Bear Stearns allegedly earned risk-free profits from use of the cash collateral and margin interest. The Short Sellers allegedly profited when the securities' value in fact declined, at which point they bought the securities and were able to cover.

According to plaintiffs' allegations, during the time of the short selling scheme, the volume of sell orders for the securities at issue increased. Many of the securities sold were sold to Creative. The increase in sell orders resulted in a decline in the subject securities' market value. Because NASD members were not required to re-port or publish their short positions, Creative was unaware that the increase in sell orders was due to short sales. Thus, unknowingly, Creative was continuously buying securities that were declining in value. As a result of the short selling scheme, plaintiffs assert that Creative's net worth decreased drastically and, after taking out loans, the company, on July 9, 1985, was eventually forced to cease operations. The Customers claim they lost money because the value of their security holdings decreased.

Alleging loss and indebtedness, plaintiffs brought an action against Bear Stearns,[4] its former general partners, and some of its employees.[5] Defendants, however, move under the Arbitration Act to stay this action and compel arbitration of plaintiffs' claims pursuant to the arbitration rules of the NASD or various arbitration agreements contained in other contracts between the parties.

## DISCUSSION

The Federal Arbitration Act ("the Act" or "Arbitration Act"), 9 U.S.C. §§ 1–14, establishes a "federal policy favoring arbitration." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). The Act, "reversing centuries of judicial hostility to arbitration agreements," *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510–511, 94 S.Ct. 2449, 2453, 41 L.Ed.2d 270 (1974), was designed to enable parties to avoid "the costliness and delays of litigation," and to place arbitration agreements "upon the same footing as oth-

**4.** Plaintiffs allege that Bear Stearns agreed to participate in the manipulative scheme in several ways, including: 1. acting as market maker for these securities and periodically inserting the lowest bid and ask prices for the securities on NASDAQ; 2. loaning the securities needed by the Short Sellers to cover the Short Sellers or their customers' short sales from the securities accounts of Creative and its customers and giving more than the normal five days to cover; 3. allowing multiple collateralization of the same securities; 4. not requiring full cash collateral for the securities loaned; 5. not marking to market the securities loaned; and 6. providing the Short Sellers with confidential information concerning the amount of securities owned by Creative and its customers.

**5.** Plaintiffs allege that defendants Harriton, Gangey, and Thomas made a number of material untrue representations and omissions to Mazzeo, including: 1. representing that no one was short the subject securities; 2. representing that Bear Stearns was receiving timely delivery on the sales of these securities; 3. omitting that Bear Stearns knew who was short selling these securities; and 4. omitting that Bear Stearns was loaning the securities from Creative's trading account and the cash accounts of Creative's customers.

er contracts ..." H.R.Rep. No. 96, 68th Cong., 1st Sess. 1, 2 (1924) (quoted in *Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 844 (2d Cir.1987)).

To accomplish these purposes, the Act provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.[6] The Act also mandates that a court must stay its proceedings if it is satisfied that an issue before it is arbitrable under the agreement, 9 U.S.C. § 3, and it empowers a federal district court to issue an order compelling arbitration if there has been a "failure, neglect, or refusal" to comply with an arbitration agreement. 9 U.S.C. § 4. "By its terms, the [Arbitration] Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 218, 105 S.Ct. 1238, 1241, 84 L.Ed.2d 158 (1985).

▮ Arbitration, however, is purely a matter of contract, and a party cannot be required to submit a dispute to arbitration unless he has agreed to do so. *Fils et Cables D'Acier de Lens v. Midland Metals Corp.,* 584 F.Supp. 240, 244 (S.D.N.Y.1984). "[O]rdinary principles of contract and agency determine which parties are bound by an agreement to arbitrate." *McAllister Bros. Inc. v. A & S Transportation Co.,* 621 F.2d 519, 524 (2d Cir.1980). As noted above, a party need not have signed the agreement to be bound by it as long as the arbitration provision itself is in writing. *Fisser v. International Bank,* 282 F.2d 231, 233 (2d Cir.1960). Rather, the reach of the arbitration clause must be interpreted according to the parties' intentions and by

ascertaining and examining the context in which it was made. *S.A. Mineracao da Trindade–Samitri v. Utah International, Inc.,* 576 F.Supp. 566, 570 (S.D.N.Y.1983), *aff'd,* 745 F.2d 190 (2d Cir.1984).

Because of the strong federal policy favoring arbitration, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp., supra,* 460 U.S. at 24–25, 103 S.Ct. at 941. "[L]anguage excluding certain disputes from arbitration must be 'clear and unambiguous' or 'unmistakably clear' and ... arbitration should be ordered 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *S.A. Mineracao da Trindade–Samitri v. Utah Int'l, Inc., supra,* 745 F.2d at 194 (quoting *Wire Service Guild v. United Press International,* 623 F.2d 257, 260 (2d Cir.1980)).

▮ When considering a motion to stay proceedings and compel arbitration under the Act, a court has four tasks: first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration. *Genesco, Inc. v. T. Kakiuchi & Co., supra,* 815 F.2d at 844. With these tasks in mind, the Court now

---

**6.** The Supreme Court has observed that Section two of the Act and the Act as a whole represent "a policy guaranteeing the enforcement of private contractual arrangements: the Act simply 'creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate.'" *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 625, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985) (quoting *Moses H. Cone Memorial Hospi-* *tal v. Mercury Construction Corp.,* 460 U.S. 1, 25 n. 32, 103 S.Ct. 927, 942 n. 32, 74 L.Ed.2d 765 (1983)). Congress' principal concern in passing the Act was: "'to enforce private agreements into which parties had entered,' a concern which 'requires [federal courts to] enforce agreements to arbitrate.'" *Id.* at 625–26, 105 S.Ct. at 3354 (quoting *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 221, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985)).

turns to the arbitration agreements between the parties.

## I. The Agreements to Arbitrate and their Scope

■ There are three separate agreements to arbitrate at issue in this case. Some of the parties are "members" or "persons associated with members" of the NASD and are, therefore, contractually obligated to abide by the NASD Code of Arbitration Procedure.[7] The NASD Code provides for arbitration of "any dispute, claim or controversy arising out of or in connection with the business of any member ..." NASD Code of Arbitration Procedure, part 1, § 1, NASD Manual (CCH) ¶ 3701 (1986). The "business of any member" includes transactions between or among NASD members or between members and persons using the facilities of a registered clearing agency. *Id.* Section eight of the Code provides that any such

claim *"shall be arbitrated* under this Code, at the instance of: (1) a member against another member; (2) a member against a person associated with a member or a person associated with a member against a member; and, (3) a person associated with a member against a person associated with a member." *Id.* at Part II, § 8, ¶ 3708 (emphasis added). Disputes involving customers and members or associated persons are required submissions which *"shall be arbitrated"* as provided by "any duly executed and enforceable written agreement or upon the demand of the customer." *Id.* at Part III, § 12, ¶ 3712 (emphasis added). The NASD arbitration code mandates arbitration to resolve disputes falling within these provisions. Therefore, the parties in this case must arbitrate their disputes if the Court determines that they have consented to abide by the NASD provisions and no private contract[8] or federal policy[9] precludes the arbitration.

---

**7.** NASD is a self-regulatory organization within the meaning of Section 28(b) of the 1934 Securities Exchange Act. 15 U.S.C. § 78bb(b). Its members can agree to settle their disputes by arbitration. *Goldberg v. Donaldson, Lufkin & Jenrette Securities Corp.,* 650 F.Supp. 222, 226 (N.D.Ga.1986). There is no requirement that such arbitration agreements must be signed by the party to be charged in order to be enforceable. *Id.* Many courts have recognized that securities exchange members are contractually bound by the regulations of their organizations, including any arbitration provisions. *See e.g., Muh v. Newburger, Loeb & Co.,* 540 F.2d 970, 972 (9th Cir.1976); *Coenen v. R.W. Pressprich & Co.,* 453 F.2d 1209, 1211 (2d Cir.), *cert. denied,* 406 U.S. 949, 92 S.Ct. 2045, 32 L.Ed.2d 337 (1972); *Goldberg v. Donaldson, Lufkin & Jenrette Securities Corp., supra,* 650 F.Supp. at 226 (compiling cases); *Morgan, Olmstead, Kennedy & Gardner v. United States Trust,* 608 F.Supp. 1561, 1563 (S.D.N.Y.1985); *Brown v. Gilligan, Will & Co.,* 287 F.Supp. 766, 769 (S.D.N.Y.1968) ("constitution and rules of a stock exchange constitute a contract between all members of the exchange with each other and with the exchange itself").

**8.** The language in section eight of the NASD Code that arbitration is required "at the instance of" an affected party clearly indicates that for arbitration to occur, it must be submitted to the NASD by a member, person associated with a member, or a customer. If both parties agree to make alternative arrangements for the resolution of their dispute, the above language does not apply and arbitration is therefore not mandatory. *See John Olagues Trading Co. v. First*

*Options of Chicago, Inc.,* 588 F.Supp. 1194, 1199 (N.D.Ill.1984) (enforcing rules of an Exchange and a private contract between the parties). *See also Morgan, Olmstead, Kennedy & Gardner v. United States Trust, supra,* 608 F.Supp. at 1569 (parties can waive right to arbitrate); *Cullen v. Paine, Webber, Jackson & Curtis, Inc.,* 587 F.Supp. 1520, 1524 (N.D.Ga.1984) (same). *Cf.,* NASD Code of Arbitration Procedure, part 3, § 17, NASD Manual (CCH) ¶ 3717 (1986) (providing that settlements upon any matter shall be at the election of the parties).

**9.** The law provides that arbitration agreements between members of self-regulatory organizations are valid and enforceable with two limited exceptions: first, arbitration should not be ordered if there was fraud in the inducement to become a member of the organization, *see N. Donald & Co. v. American United Energy Corp.,* 746 F.2d 666, 670 (10th Cir.1984) (citing *Rice v. McDonnell & Co.,* 386 F.Supp. 315 (S.D.N.Y. 1974)); and second, the arbitration agreement should not be enforced if the dispute involves a "wholesale fraud of institutional dimension." *Allegaert v. Perot,* 548 F.2d 432, 437 (2d Cir.), *cert. denied,* 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1084 (1977). In *Allegaert,* the Second Circuit refused to stay litigation pending arbitration in an action brought by a trustee in bankruptcy involving the collapse of one of the major brokerage houses on Wall Street.

The Court finds that neither of the two exceptions are applicable to this case. None of the parties allege fraud with respect to their membership in the NASD. Moreover, although the

Some of the parties in this case have entered into private contracts to govern disputes arising in particular areas. Bear Stearns and Creative are parties to a Clearing Agreement which has an arbitration provision. This contract provides that:

[a]ll disputes and controversies relating to or any way arising out of this Agreement shall be settled by arbitration before and under the rules of the Arbitration Committee of the New York Stock Exchange, Inc., unless the transaction which gives rise to such dispute or controversy is effected in another United States market which provides arbitration facilities, in which case it shall be settled by arbitration under such facilities.

Clearing Agreement, at 24(b). Because the transactions giving rise to the present action arose in the over-the-counter market, where the NASD has self-regulatory responsibilities, arbitration pursuant to the Clearing Agreement should occur under the auspices of the NASD. *See generally* Harold S. Bloomenthal, Securities Law Handbook, §§ 1.02, 3.02 (1986–87).

Some of the parties in this action are also signatories to a third contract, a Customer Agreement. This contract provides for arbitration as follows:

Any controversy arising out of or relating to your account in connection with transactions between us or pursuant to this Agreement or the breach thereof shall be settled by arbitration in accordance with the rules, then in effect, of the National Association of Securities Dealers, Inc., the Board of Governors of the New York Stock Exchange, Inc. or the Board of Governors of the American Stock Exchange, Inc. as you may elect. If you do not make such election by registered mail ... within five days after demand by Bear Stearns that you make such election, then Bear Stearns may make such election. Judgment upon any

award rendered by the arbitrators may be entered in any court having jurisdiction thereof. You understand that this Agreement to arbitrate does not constitute a waiver of your right to a judicial forum where such waiver would be void under the securities laws and specifically does not prohibit you from pursuing any claim or claims arising under the federal securities laws in any court of competent jurisdiction.

Customer Agreement, at 13.

■ Because some of the parties are subject to all three agreements, while others are signatories only to one or two agreements, the Court must determine the scope of each of the arbitration provisions so as to decide correctly which counts of the complaint should be sent to arbitration. Examining all three arbitration clauses, the Court finds that the broadest arbitration clause by far is the NASD provision, which provides for the arbitration of any dispute, claim, or controversy arising out of or in connection with the business of any member. However, this arbitration provision can be modified by an agreement between the parties. Thus, both the Clearing Agreement and the Customer Agreement can validly modify the arbitration provisions of the NASD as they apply to the parties to such agreements. The arbitration provisions of the Clearing Agreement cover all controversies and disputes arising out of the Clearing Agreement, while the arbitration provisions of the Customer Agreement cover all controversies arising out of or relating to customer accounts. The only exception to this is the clause in the Customer Agreement stating that the Customer Agreement specifically does not prohibit a customer from pursuing any claim or claims arising under the federal securities laws in any court of competent jurisdiction. The Court interprets this language to provide only that the Customer Agreement itself does not waive a custom-

alleged fraudulent short selling scheme may be considered substantial, in this Court's view, it does not rise to the level of "wholesale fraud of institutional dimension." *See N. Donald & Co. v. American United Energy Corp., supra,* 746 F.2d at 670 (simple assertion of securities law violations or even the assertion of massive secu-

rities law violations does not overcome the weighty presumption that arbitration is proper in disputes between members of self-regulatory organizations). Accordingly, the parties fail to come within the two federal policy exceptions and the arbitration agreement between the NASD members is enforceable.

er's right to sue for securities violations in federal court, not necessarily to grant a right to bring a federal securities action. Thus, if the customer is otherwise contractually obligated to arbitrate federal securities claims (such as being bound to the rules of a self-regulatory organization), the Customer Agreement will not stand as a bar to arbitration. With these interpretive principles in mind, the Court now turns to an analysis of each count of the complaint.[10]

## II. Analysis of the Complaint

The Complaint has nine causes of action asserted by the various plaintiffs against the various defendants. The causes of action include Securities Exchange Act of 1934 ("Exchange Act") violations, conversion, common law fraud, breach of fiduciary duty, breach of contract, conspiracy, interference with contractual relations, and Racketeer Influenced and Corrupt Organizations Act ("RICO") violations. The Supreme Court has recently indicated that predispute arbitration agreements between parties requiring arbitration of section 10(b) claims under the Exchange Act and RICO claims are enforceable under the Arbitration Act. *Shearson/American Express Inc. v. McMahon*, — U.S. —, 107 S.Ct. 2332, 2343–46, 96 L.Ed.2d 185 (1987). Thus, if valid arbitration agreements have been entered into by the parties, all of the causes of action in the complaint are arbitrable.

### A. Count I—§ 10(b) of Exchange Act and Rule 10b–5

In Count I, plaintiffs Creative and Mazzeo allege violations of § 10(b) of the Exchange Act and Rule 10b–5 against the Bear Stearns defendants, Bear Stearns Partners, Harriton, Gangey, and Thomas. Creative and the Bear Stearns defendants are members of the NASD, while the Bear Stearns Partners, Harriton, Gangey, and Thomas are persons associated with a member of the NASD. *See* NASD By-Laws, Art. 1, § (m), NASD Manual (CCH) ¶ 1101 (1986). Creative and Mazzeo are parties to all three contracts, as are the Bear Stearns defendants, Bear Stearns Partners, Harriton, Gangey, and Thomas.[11] Therefore, the NASD arbitration provisions are applicable except where modified with respect to this cause of action by either the Clearing Agreement or the Customer Agreement.

■ Count I alleges a securities violation that primarily resulted in a decrease in the value of the securities held by plaintiffs and a subsequent decline in Creative's net worth. *See* Complaint, ¶ 203. As such, the damage to the plaintiffs occurred in their capacity as Customers. Hence, the Customer Agreement is applicable. As discussed above, the Customer Agreement it-

---

10. In this analysis, it is not necessary for the Court to consider the counts that have been brought against the non-moving defendants, such as the Short Sellers, Abelson, and Mary Smith. The Court, therefore, expresses no opinion with respect to where an action against these parties can properly proceed.

11. The claims against Harriton, Gangey, and Thomas arise solely out of their activities as employees of Bear Stearns. In *Brener v. Becker Paribas Inc.,* 628 F.Supp. 442 (S.D.N.Y.1985), the plaintiff brought an action against a broker and an employee, the head of the broker's bond department. In opposing a motion to refer the claims to arbitration, the plaintiff asserted that she could not be forced to arbitrate her claims against the employee because he was not a party to the agreement containing the arbitration provision. The court disagreed, holding:

> The agreement provides that any controversy arising out plaintiff's account will be settled by arbitration. All of plaintiff's allegations

against Corwin arise out of his actions as Becker's employee in connection with the plaintiff's account. Thus, the plaintiff's claims against Corwin fall squarely within the scope of the arbitration agreement.

*Id.* at 451. *See also Ross v. Mathis,* 624 F.Supp. 110, 113 (N.D.Ga.1985). Similarly, plaintiffs' claims against Harriton, Gangey, and Thomas all arise out of the employee relationship. Accordingly, for the purposes of arbitration, these defendants should be considered parties to the Clearing and Customer Agreements. The Court notes, however, that the same result would be reached even if the employees were not considered parties to either the Customer or Clearing Agreements. Under this analysis, Harriton, Gangey, and Thomas, as persons associated with a member of the NASD, would be bound by the NASD arbitration code. As a result, the Court would find that Count I must also be arbitrated pursuant to the NASD rules.

self specifically does not waive the right of plaintiffs to litigate their securities claims in a federal forum. Therefore, with respect to this securities count, the arbitration provision of the Customer Agreement does not apply. However, both plaintiffs and defendants, contractually bound by the NASD rules, have already agreed to send all disputes, including securities claims, to arbitration. Since the Customer Agreement does not alter this agreement between the parties, the NASD Code of Arbitration Procedure is controlling. Accordingly, Count I with respect to all of the defendants must be arbitrated pursuant to the NASD Code of Arbitration Procedure.

**B.** *Count II—Conversion*

■ In Count II, plaintiffs Dedde and the Customers allege that the Bear Stearns defendants and Bear Stearns Partners wrongfully converted their property by improperly loaning out their securities. Dedde is a person associated with a member of the NASD as well as a signatory to a Customer Agreement. The customers are only parties to the Customer Agreement. The NASD arbitration provisions are therefore applicable to Dedde and the defendants unless modified by the Customer Agreement.

Because Count II requests damages for the unlawful use of Dedde's and the other Customers' securities when they were in the defendants' possession, the Court finds that the damages to plaintiff Dedde allegedly occurred in his capacity as a customer. *See* Complaint, ¶ 232–233. As a result, the Customer Agreement has modified the arbitration rules of the NASD as they affect this count. Since this is not a securities claim, the Customer Agreement requires the dispute to be arbitrated in a forum selected by the customer. Under the Agreement, Dedde has the option of arbitration before the NASD, the Board of Governors of the New York Stock Exchange, Inc. or the Board of Governors of the American Stock Exchange, Inc. Sim-

ilarly, the Customers, as signatories to Customer Agreements, must arbitrate this count under such Agreements. They also can select the forum under which arbitration will occur.[12]

**C.** *Count III—Common Law Fraud*

In Count III, plaintiffs Creative and Mazzeo assert that the Bear Stearns defendants, Bear Stearns Partners, Harriton, Gangey, and Thomas committed common law fraud. As with respect to Count I, all of the plaintiffs and defendants are parties to all three contracts.

Count III avers that defendants utilized material misrepresentations and omissions and other fraudulent devices to conceal the short selling scheme. Again, they are essentially alleging damages concerning the value of their securities. *See* Complaint, ¶¶ 237–239. As such, the damage to the plaintiffs occurred in their capacity as Customers. Hence, the Customer Agreement is applicable and the plaintiffs can select where arbitration will occur.

**D.** *Counts IV and V—Breach of Fiduciary Duty and Contract*

In Count IV and V, Creative and Mazzeo claim that the Bear Stearns defendants and Partners breached their fiduciary and contractual duties under the Clearing Agreement. As with Counts I and III, the parties are signatories to all three agreements.

An analysis of Counts IV and V indicates that plaintiffs' claims specifically arise under the Clearing Agreement. Plaintiffs allege that the Clearing Agreement establishes a duty of good faith and a confidential relationship, *see* Complaint, ¶¶ 241, 245, which defendants breached by their participation in the fraudulent scheme. Accordingly, the Court finds that arbitration of Counts IV and V must occur under the provisions of the Clearing Agreement, which require that the dispute be submitted before the NASD.

---

**12.** The Court observes that Dedde and the Customers, in their capacity as customers, would have the option of demanding an NASD arbitration submission, even if a duly executed and

enforceable arbitration agreement didn't exist. *See* NASD Code of Arbitration Procedure, part 3, § 12, NASD Manual (CCH) ¶ 3712 (1986).

### E. Count VI—Conspiracy

In Count VI, Creative, Mezzeo, Dedde, and the Customers allege that the Bear Stearns defendants and Bear Stern Partners entered into a conspiracy to lower the market price of plaintiffs' securities. Plaintiffs Creative and Mezzeo and the Bear Stearns defendants and Partners are signatories to all three agreements. Dedde is a party to the NASD agreement and the Customer Agreement, while the Customers are parties only to the Customer Agreement.

As with the conversion and common law fraud claims, plaintiffs' conspiracy claim relates to the alleged short selling scheme. Plaintiffs specifically allege a conspiracy pursuant to which the defendants acted to defraud plaintiffs and manipulate downward the market prices of securities owned by plaintiffs. *See* Complaint, ¶ 250. The Court, therefore, finds that with respect to this count, plaintiffs have suffered damages in their capacity as customers. Inasmuch as this count does not arise under the securities laws, the arbitration provisions of the Customer Agreement should be applied to require arbitration of Creative's, Messeo's, and Dedde's claims. Similarly, the Customers are bound by the arbitration provisions of the Customer Agreement.

### F. Count VII—§ 10(b) of Exchange Act and Rule 10b–5

In Count VII, Dedde and the Customers allege violations of § 10(b) of the Exchange Act and Rule 10b–5 against the Bear Stearns defendants and the Bear Stearns Partners. As with Count I, this count alleges a securities violation that primarily resulted in a decrease in the value of the securities owned by plaintiffs. *See* Complaint, ¶ 258. Accordingly, the damage to the plaintiffs occurred in their capacity as customers. Hence, the Customer Agreement is applicable. As discussed in Count I above, the Customer Agreement itself specifically does not waive the right of Dedde or the Customers to litigate their securities claims in a federal forum. Therefore, with respect to this count, the arbitration provision of the Customer Agreement is not relevant. Being bound by no other contract, the Customers can proceed on this count in federal court. However, plaintiff Dedde, as a person associated with a member of the NASD, is contractually bound by the NASD rules to send all disputes, including securities claims, to arbitration. Since the Customer Agreement does not alter this agreement between Dedde and the defendants, the NASD rules apply. Consequently, while the Customers can litigate Count VII, Dedde must arbitrate his claims pursuant to the NASD Code of Arbitration Procedure.

### G. Count VIII—Interference with Contractual Relationships

In Count VIII, Dedde avers that the Bear Stearns defendants and the Bear Stearns Partners interfered with his contractual relationships. Specifically, Dedde asserts that, as a registered representative, he generated income for himself and Creative by offering broker's services to individuals desiring to purchase and sell securities. As a result of defendants' participation in the short selling scheme, Dedde claims that many of the individuals who utilized Dedde's services lost money and terminated their contractual relationships with him. *See* Complaint, ¶¶ 262–266. Because this claim arises out of Dedde's role as a registered representative, rather than his role as a customer, the Customer Agreement is not implicated. The Court, therefore, finds that this dispute should be arbitrated in accordance with the NASD Code of Arbitration Procedure.

### H. Count IX—RICO

In Count IX, Creative, Mezzeo, Dedde, and the Customers allege that the Bear Stearns defendants, Bear Stern Partners and Harriton engaged in an "enterprise," as defined in RICO, 18 U.S.C. § 1961(4), designed to lower the market prices of plaintiffs' securities. *See* Complaint, ¶ 275. As with the conversion, common law fraud, and conspiracy claims alleged in Counts II, III, and VI, plaintiffs in this count have suffered damages in their capacity as cus-

tomers. Inasmuch as this count specifically asserts RICO violations, which are arbitrable under federal law, *see Shearson/American Express Inc. v. McMahon, supra,* 107 S.Ct. at 2346, and are not claims "arising under the federal securities laws," Customer Agreement, at 13, the arbitration provisions of the Customer Agreement require arbitration of all of plaintiffs' claims in the forum of their choice.

### III. Appropriateness of a Stay

▮ Having found that some, but not all, of the claims in the case are arbitrable, the Court must now decide whether to stay the remaining claims pending arbitration. The decision to stay the balance of the proceedings pending arbitration is a matter largely within the district court's discretion. *Genesco, Inc. v. T. Kakiuchi & Co., Ltd., supra,* 815 F.2d at 856. In *Chang v. Lin,* 824 F.2d 219 (2d Cir.1987), the Second Circuit considered whether a district court erred in staying claims under the Securities Act of 1933 ("1933 Act") pending the arbitration of state law claims. In holding that the district court was incorrect in staying the federal claims, the Court stated:

> A plaintiff has the right to litigate a '33 Act claim in a federal court notwithstanding any arbitration agreement with the defendant.... This right is substantially diminished if such claims must lay dormant until other claims arising out of the same series of events have been arbitrated. Evidence supporting the federal claims may become stale or unavailable prior to the conclusion of the arbitration. Moreover, delay generally works to the advantage of defendants who may well be inclined to prolong the arbitration unnecessarily in the hope that plaintiffs ultimately will be forced to abandon their nonarbitrable claims. If nonarbitrable federal claims are stayed pending the arbitration of other federal or state claims, plaintiffs alleging fraud in securities transactions face the unhappy choice of either forgoing arbitrable claims in

order to obtain prompt consideration of the other claims or waiting months, if not years, before their nonarbitrable claims will be heard by a federal court.

*Id.* at 222. The Court held that, at least with respect to securities claims arising under the 1933 Act, "arbitration and federal litigation should proceed simultaneously absent compelling reasons to stay the litigation." *Id.* at 223.

Although the federal claims in this case arise under the Exchange Act, rather than the 1933 Act, this Court is persuaded that the considerations governing *Chang* are applicable here. Even though the Customers in this action agreed to arbitrate all of their other claims, they specifically did not waive their right to litigate their federal securities claims. As in *Chang,* this right may be seriously threatened if the Customers cannot litigate until the completion of arbitration with respect to their other claims. The Court finds no reason why the Customers' claims under the Exchange Act should not be litigated in their normal course while the arbitrable claims proceed to arbitration.[13] Defendants' motion to stay the nonarbitrable claims is therefore denied.

### CONCLUSION

To summarize, this Court finds that Counts I, VIII, and Dedde's claim under Count VII should be arbitrated pursuant to the NASD Code of Arbitration, Counts II, III, VI, and IX should be arbitrated pursuant to the Customer Agreement, and Counts IV and V should be arbitrated before the NASD pursuant to the Clearing Agreement. The Customers' claim under Count VII can be litigated in federal court. Moreover, the Court sees no reason why the Customers' Exchange Act claims should be stayed pending completion of the arbitration proceedings. Accordingly, defendants' motion to stay this action and

---

13. In fact, litigation against a number of other defendants not parties to this motion, such as the Short Sellers and Abelson, will also be proceeding in federal court. Thus, this is not a situation where "the arbitrable claims predominate the lawsuit and the nonarbitrable claims are of questionable merit." *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.,* 815 F.2d 840, 856 (2d Cir.1987).

**972**

refer all of plaintiffs' claims to arbitration is granted in part and denied in part.

It is so ordered.