**POMPANO–WINDY CITY PARTNERS, LTD., et al., Plaintiffs,**

v.

**BEAR, STEARNS & CO., INC., et al., Defendants.**

No. 87 CIV. 7560 (PKL).

United States District Court, S.D. New York.

Oct. 27, 1988.

Mark A. Cymrot, Cole Corette & Abrutyn, Laurence Storch, Joel F. Brenner, Storch & Brenner, Washington, D.C., for plaintiffs.

Steven L. Ratner, Rosenman & Colin, New York City, for defendants.

## OPINION AND ORDER

LEISURE, District Judge:

On October 19, 1987, a day that has become known in financial circles as "Black Monday," the financial markets of this country and the world were shaken to an extent unprecedented in this century. The incomprehensible complexities of the forces underlying those events may never be fully fathomed or understood. The shock waves of that eventful day, however, altered what previously were relatively tranquil relation-

ships among investors and institutions, and created disputes that must now be resolved. Vast amounts of apparent wealth seemingly dissipated or disappeared instantly, and the inevitable litigation soon ensued. This action arose out of events that occurred during those tumultuous few hours just over a year ago.

BACKGROUND

The plaintiffs in this case are entities that trade securities and commodities for their own account. Plaintiff Stephan J. Lawrence ("Lawrence") is an experienced and successful trader of securities. Affidavit of Stephan J. Lawrence, sworn to on February 1, 1988 ("Lawrence Affidavit"), ¶ 3. He has a majority interest in the other limited partnership plaintiffs, Pompano–Windy City Partners, Ltd. ("Pompano") and East Wind Associates, Ltd. ("East Wind"). Second Amended Complaint ("Complaint") ¶ 4. Lawrence is a general partner of both Pompano and East Wind.

There are a host of defendants in the subject action. Only certain of these defendants and their relationships to the plaintiffs, however, are relevant for the specific purposes of the motions presently before the Court.

The defendant Bear Stearns & Co., Inc. ("Bear Stearns") is a broker-dealer registered with the Securities and Exchange Commission. Among its other activities, Bear Stearns acts as a clearing broker for other broker dealers, such as the plaintiffs in this case. Broker dealer customers maintain accounts with Bear Stearns to facilitate commodity and security trading. Defendants Richard Harrington ("Harrington") and William Gangi ("Gangi") are senior managing directors of Bear Stearns. Defendant Jerry Canning ("Canning") is an associate director of Bear Stearns. Affidavit of John Callahan, sworn to on December 30, 1987 ("Callahan Affidavit"), ¶ 14. These individuals are collectively the "Bear Stearns defendants," or simply "Bear Stearns."

Bear Stearns is a member of various securities exchanges and self-regulatory bodies that are also named as defendants in this action. Some of these include the National Association of Securities Dealers ("NASD"), the American Stock Exchange, Inc. ("AMEX"), the New York Stock Exchange, Inc. ("NYSE") and the Chicago Board Options Exchange, Inc. ("CBOE"). All of the defendant exchange organizations are in turn "participating organizations" of the Option Clearing Corporation ("OCC"), an incorporated trade association.

Plaintiffs had been customers of Bear Stearns for approximately five years before the events precipitating this action. Plaintiffs primarily traded options, and their accounts with Bear Stearns were primarily options accounts. Bear Stearns provided office space and telecommunications service to Lawrence as concessions for handling his business. Lawrence Affidavit ¶ 3. The relationship between plaintiffs and Bear Stearns goes to the heart of the present dispute, and the various activities and written agreements that defined that relationship will be examined in more detail shortly. Briefly, however, there were "Customer Agreements" that are generally executed by all customers opening any kind of securities account with Bear Stearns, and there were additional "Options Agreements" entered into by each plaintiff. Lawrence Affidavit ¶¶ 4–5; Callahan Affidavit ¶¶ 20–22. The plaintiffs are also associated with certain of the exchange organizations noted above, which creates other contractual obligations.

The sharp decline that the markets experienced on October 19, 1987, significantly altered the positions of the plaintiffs' Bear Stearns accounts. On October 12, 1987 it is alleged that Pompano had equity of $20.3 million, East Wind had equity of $4.9 million, and Lawrence personally had around $200,000. Lawrence Affidavit ¶ 17. The value of plaintiffs' holdings was completely eliminated during the crash of October 19, 1987. Before the opening of business on October 20, 1987, Bear Stearns seized the plaintiffs' accounts, as it contends the relevant agreements permitted it to do. Bear Stearns alleges that at the time the accounts were seized they were in a negative equity position; that is, the plaintiffs owed Bear Stearns an amount greater than the

value of their securities. Callahan Affidavit ¶¶ 4–6. Bear Stearns asserts that the fully liquidated positions of the plaintiffs' accounts result in a $23,156,689 *debt* to Bear Stearns. Callahan Affidavit ¶ 9.

There are vigorous competing contentions regarding the actions taken and the duties imposed on all of the parties during the tumultuous events of those few days. As might be expected in a dispute of this magnitude, however, there are various levels at which the battle is being waged. The initial conflict concerns the very method by which the respective liabilities, if they exist, are to be determined. Bear Stearns and the security exchanges typically utilize arbitration mechanisms to settle disputes arising out of member and customer contractual relations, and Bear Stearns claims that the present dispute, or much of it, is properly arbitrable. Plaintiffs strenuously oppose such arbitration, and assert their claimed right to have the issues adjudicated in this Court.

The parties have generated a mountain of paper advocating the respective sides of this basically uncomplicated threshold issue, as well as becoming involved in various collateral litigious exercises. The most recent example was the filing of an additional, related action in this Court. *Pompano v. Bear Stearns, et al.,* 88 Civ. 7159 (PKL).[1] All defendants to the present action have made motions to dismiss the complaint. Papers on those motions are currently being submitted.

There are presently two substantive motions going to the arbitrability issue. Shortly after the current action was commenced, defendant Bear Stearns filed a motion to stay this proceeding pending arbitration of those aspects of the claim it asserts are clearly arbitrable. Before defendants' motion was fully submitted, plaintiffs filed a motion for a preliminary

injunction enjoining arbitration of any issues. That application also sought a temporary restraining order, which was denied by this Court in a proceeding on January 21, 1988.

During the pendency of both of these motions the plaintiffs filed their Second Amended Complaint, which included additional defendants. One of those defendants was the NASD, a member of the OCC. The NASD is one potential forum for arbitration of the claims here at issue, and the forum in which Bear Stearns has taken steps to proceed. Supplemental papers were filed addressing the issues raised by potential arbitration in a forum established by a defendant to the plaintiffs' pending action.

The substantive issues involve, initially, the arbitrability of the individual claims asserted in the Second Amended Complaint. Before even these threshold issues can be reached, however, there are collateral matters burdening this Court wholly unrelated to the actual dispute between the parties.

## THE CALLAHAN AFFIDAVIT

 As indicated above, papers supporting several motions dealing with essentially identical substantive issues have been simultaneously submitted to this Court. Further complicating this duplicative procedure, those very motions have become the subject of additional ancillary motions.

Shortly after the plaintiffs filed their motion to enjoin all arbitration, they filed a motion to strike in whole or in part the Callahan Affidavit submitted by the defendants in support of their motion to stay these proceedings.

John Callahan is an associate director of defendant Bear Stearns. The Callahan affidavit failed to recite that it was made on the basis of personal knowledge. Federal

---

1. The recently filed action names as defendants Bear Stearns, the OCC and the CBOE, who are also defendants to the earlier complaint. The remaining defendants of the second amended complaint are not named in the additional action.

 Apparently many overlapping claims and counterclaims are additionally asserted by the parties to this litigation in a California state court proceeding to which they are also parties. *Smith v. Bear Stearns, et al.,* No. WEC 123544, Superior Court for the County of Los Angeles. That action evidently involves collateral property for loans that were related to the seizures by Bear Stearns.

Rule of Civil Procedure 56(e), cited by plaintiffs, requires that affidavits submitted in support of *summary judgment* motions be made on such a basis, as well as set forth facts that would be admissable and establish the competency of the affiant.[2] Plaintiffs additionally urge that specific parts of the affidavit are argumentative, and go through a passage-by-passage critique of the affidavit.

In response, Callahan subsequently swore that his original affidavit was, in fact, made upon personal knowledge. Affidavit of John Callahan, sworn to February 17, 1988 ("Callahan Supplemental Affidavit"), ¶ 2. This moots the most serious defect of the affidavit. *Cf. Liberty Curtin Concerned Parents v. Keystone Central School Dist.*, 81 F.R.D. 590, 604 (M.D.Pa. 1978). The defendant did not stop there, however, but claimed that plaintiffs' motion was made "solely to harrass," and moved for sanctions under Fed.R. of Civ.P. 11. The affidavit in its original form was insufficient; a motion to strike was not so unfounded as to have "no chance of success." *Cf. Oliveri v. Thompson*, 803 F.2d 1265, 1275 (2d Cir.1986), *cert. denied sub nom. County of Suffolk v. Graseck*, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987). This Court has previously noted that Rule 11 motions can be potentially "frivolous and baseless themselves." *International Shipping Co. v. Hydra Offshore, Inc.*, 675 F.Supp. 146, 154 (S.D.N.Y. 1987). The motions for sanctions and to strike the Callahan affidavit in whole or in part are denied.

## ARBITRATION

The substance of both the plaintiffs' preliminary injunction motion and the defendant's motion to stay essentially concerns the arbitrability of the thirteen counts of the Complaint, the claimed debt by the plaintiffs to Bear Stearns, and the interrelationship of those respective liabilities. Determination of arbitrability requires scrutiny of each of these areas, with respect to the agreements between the parties. As indicated below, some claims are clearly independently arbitrable, and others are not. The Court must determine the effect of this situation in light of the action in this Court, a contemplated arbitration proceeding, the specific motions by the parties, and of course the controlling law.

In *Genesco Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840 (2d Cir.1987), the Second Circuit defined the District Court's task in determining whether to stay proceedings pending arbitration. The Court must determine whether the parties agreed to arbitrate, and the scope of that agreement must be ascertained. If federal statutory claims are asserted, the Court must consider whether Congress intended that those claims be arbitrable. Finally, if the Court concludes that some, but not all, of the claims are arbitrable, it must decide whether to stay the balance of the proceeding. *Genesco*, 815 F.2d at 844.

The inquiry here proceeds, of course, against the background of a strong "federal policy favoring arbitration." *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987). "[A]ny doubts concerning the scope of arbitral issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay or a like defense to arbitrability." *Moses H. Cone Memorial Hosp. v. Mercury Construction Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1982); *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 847 (2d Cir.1987). Where arbitrable claims are asserted, arbitration is required even if other, non-arbitrable claims are set forth. *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985).

It is equally fundamental, however, that arbitration is a creature of contract. Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* The Act "'places arbitration contracts on the same footing as other contracts,'" *Shearson/American Express*, 107 S.Ct. at 2337, quoting *Sherk v. Alberto–Culver Co.*, 417 U.S. 506, 510, 94 S.Ct. 2449, 2453,

---

**2.** Local Rule 3(c) is also cited by plaintiffs for the proposition that affidavits are required in support of motions generally; the rule does not stand for such an across-the-board requirement.

41 L.Ed.2d 270 (1974); *see also,* H.R.Rep. No. 96, 68th Cong., 1st Sess. (1924). Arbitration agreements are "as enforceable as other contracts, but not more so." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404 n. 12, 87 S.Ct. 1801, 1806 n. 12, 18 L.Ed.2d 1270 (1967). The predicate question with regard to the arbitrability of each claim, then, is whether the the parties in fact agreed to arbitrate. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985); *Genesco,* 815 F.2d at 844.

### 1. The Agreements to Arbitrate.

Bear Stearns contends that there are two aspects of the contractual relationships between it and the plaintiffs that require arbitration. The first source is found in the Customer Agreements executed between the plaintiffs and Bear Stearns. Additionally, Bear Stearns and the plaintiffs are said to be contractually bound by the rules of the various exchange organizations of which they are members.

### A. The Contracts Between Bear Stearns and Plaintiffs.

As noted above, Pompano, East Wind and Lawrence each entered into a "Customer Agreement" as part of maintaining the accounts with Bear Stearns. *See,* Exhibits B, D and F, respectively, attached to Callahan Affidavit. Each of those agreements contains an identical provision that reads as follows:

ARBITRATION. It is understood that the following agreement to arbitrate does not constitute a waiver of the right to seek a judicial forum where such a waiver would be void under the federal securities laws.

The undersigned agrees, and by carrying an account for the undersigned you agree, that except as inconsistent with the foregoing sentence, all controversies which may arise between us concerning any transaction or construction, performance or breach of this or any other agreement between us, whether entered into prior, on or subsequent to the date hereof, shall be determined by arbitration in accordance with the rules, then in effect of the [NASD], Board of Governors of the [NYSE], or the Board of Governors of the [AMEX], as you may elect ...

There is a second set of agreements between Bear Stearns and the plaintiffs. These agreements are termed Options Agreements as to Pompano and East Wind; there is an additional Lawrence agreement that is also termed a Customer Agreement. *See,* Exhibits C, E and H respectively, attached to the Callahan Affidavit. This second set of agreements contain identical provisions that read as follows:

ARBITRATION Any controversy arising out of or relating to your account in connection with the transactions between us or pursuant to this Agreement or the breach thereof shall be settled by arbitration in accordance with the rules, then in effect, of the [NASD], the Board of Governors of the [NYSE] or the Board of Governors of the [AMEX], as you may elect.... You understand that this Agreement to arbitrate does not constitute a waiver of your right to a judicial forum where such a waiver would be void under the securities laws and specifically does not prohibit you from pursuing any claim or claims arising under the securities laws in any court of competent jurisdiction.[3]

### B. The Exchange Rules.

Pompano is a member of the CBOE, and a market maker on that exchange.[4] Lawrence is a "person associated with a member" of the CBOE. Rule 18.1 of the CBOE provides for arbitration of:

---

**3.** There is an additional Customer Agreement between East Wind and Bear Stearns that contains an arbitration provision identical to that in the Options Agreements.

**4.** A market maker is a broker-dealer who holds himself out "as being willing to buy and sell [a] security for his own account on a regular or continuous basis." 15 U.S.C. § 78c(a) (38); *Jaksich v. Thomson McKinnon Sec. Inc.,* 582 F.Supp. 485, 493 n. 8 (S.D.N.Y.1984); L. Loss, Fundamentals of Security Regulation 600 (2d ed.1988).

"[a]ny dispute, claim or controversy, arising between parties who are members or persons associated with a member which arises out of Exchange business."

That rule explicitly states that the arbitration provision does "not constitute a prospective waiver of any right of action that may arise under the federal securities laws." CBOE Rules, attached as Exhibit J to Callahan Affidavit.

East Wind is a member of AMEX, and a market maker on the AMEX. Lawrence is a "partner of a member firm" of the AMEX. Callahan Affidavit, ¶¶ 10–12. The AMEX Constitution provides;

> Members, member firms, partners of member firms, member corporations and officers of member corporations shall arbitrate all controversies arising in connection with their business between or among themselves or between them and their customers as required by any customer's agreement or, in the absence of a written agreement, if the customer chooses to arbitrate ...

AMEX Constitution, attached as Exhibit I to Callahan Affidavit. Unlike the CBOE rules, the AMEX Constitution does not specifically exclude securities law claims, and those claims are arbitrable under the latter provision.

The effect and scope of these provisions will be presently examined with respect to the various claims, but initially it is clear that the AMEX rules do not on their face apply to Pompano. *See,* Lawrence Affidavit ¶ 15. It is well established that exchange rules are enforceable as contracts to arbitrate among exchange members. *See, e.g., McMahon,* 107 S.Ct. at 2340–41; *Creative Securities Corp. v. Bear Stearns & Co.,* 671 F.Supp. 961, 966 n. 7 (S.D.N.Y. 1987), *aff'd* 847 F.2d 834 (2d Cir.1988).

### 2. Application of the Arbitration Agreements.

An individual claim at issue here will be arbitrable if: 1) the scope of the above agreements encompass the claim, 2) if there is no countervailing Congressional mandate regarding the nature of the specific claim, and 3) if there is no independent, overriding legal or equitable concern that would require that the claim not be arbitrated. These first two elements of the inquiry will be applied against the various claims. The broad, general objections to arbitration itself will then be addressed.

### A. Count I: Breach of Contract.

■ Plaintiffs allege that Bear Stearns breached its agreements with plaintiffs through the following actions: in seizing Pompano's positions without first notifying Pompano of a margin call, in liquidating Pompano's positions at or near the day's lowest prices, in opening new positions in Pompano's account by selling securities short, and in not accounting accurately or consistently to Pompano. Complaint ¶ 38. Breaches are also alleged for the liquidation of East Wind's account without notice, Complaint ¶ 39, and in seizing and mishandling security provided for loans to Lawrence. Complaint ¶ 40.

These contract claims warrant little discussion; they are clearly arbitrable. *Creative Securities,* 671 F.Supp. at 969; *Appel v. Kidder, Peabody & Co.,* 628 F.Supp. 153, 158 (S.D.N.Y.1986). These specific claims arise out of the agreements signed by all plaintiffs, Complaint ¶ 21, and fall squarely within the scope of those agreements.

### B. Counts II and XIII: Breach of Fiduciary Duty and Bad Faith.

■ Plaintiffs allege that defendants breached their fiduciary duties through the same actions that constitute breach of their contractual duties, and by falsely representing Pompano's financial condition to Index Futures Group, Inc. ("Index"), a futures commission merchant and Pompano's commodity clearing firm. Complaint ¶¶ 44–49.

The fiduciary duty and bad faith claims arise out of the contractual relationships of the parties, and are within the scope of those agreements. They are independently arbitrable. *Appel v. Kidder, Peabody & Co.,* 628 F.Supp. 153 (S.D.N.Y.1986); *Creative Securities,* 671 F.Supp. at 969. A fiduciary duty claim is additionally arbitrable if it is a mere "reformulation of a

breach of contract claim." *McMahon v. RMS Electronics, Inc.,* 618 F.Supp. 189, 191 (S.D.N.Y.1985).

### C. Counts III, V and VI: Tort Claims.

■ Plaintiffs allege in Count III that defendants committed fraud, acted negligently and converted plaintiffs' property. The basis of these claims include the actions that allegedly constituted breaches of contract, the liquidation of Pompano's positions at prices different than those received by other customers with identical positions, Complaint ¶ 54, in not allocating prices fairly during the liquidation of Pompano's positions, Complaint ¶¶ 55–58, in making threats and fraudulent demands upon Index so that Index would transfer Pompano and East Wind positions to Bear Stearns, Complaint ¶ 60, and in stating to Index that Lawrence had instructed Bear Stearns to direct Index to transfer Pompano's positions at Index to Bear Stearns.

Count V of the Complaint alleges that the defendants tortiously interfered with plaintiffs' contractual and business relations in taking the actions that allegedly breached the Customer Agreements, in barring a CBOE floor trader from entering the floor of the CBOE, and in causing an employee to leave his employment with Lawrence. Complaint ¶ 77.

Finally, in Count VI plaintiffs allege that defendants defamed plaintiffs in taking the actions that allegedly breached their Customer Agreements, in spreading false rumors about the extent of plaintiff's losses and deficit with Bear Stearns, Complaint ¶ 81, and in beginning to liquidate East Wind's account. Complaint ¶ 82.

The issue with regard to all of these tort claims is whether, and to what extent, they are reformulations of the plaintiff's contract claims. Those contract claims, as noted above, are undoubtedly arbitrable under the agreements between the parties. "When a tort claim is based in substantial part on the contractual rights and responsibilities of the two parties, then it must be arbitrated as required by the arbitration clause." *RMS Electronics, Inc.,* 618 F.Supp. at 191. *See also, Altshul Stearn & Co., Inc. v. Mitsui Bussan Kaisha, Ltd.,* 385 F.2d 158, 159 (2d Cir.1967).

The claims constituting Counts III and V require little discussion; the Court finds that they arise out of the contractual rights and liabilities of the parties, and are arbitrable under the various agreements. *Creative Securities,* 671 F.Supp. at 969–70. *See also, First Citizens Municipal Corp. v. Pershing Division of Donaldson, Lufkin & Jenrette Securities Corp.,* 546 F.Supp. 884, 886 (N.D.Ga.1982) (interference with business relationships claim arbitrable under agreement).

The defamation claim of Count VI presents a closer question. If the defamation was "on its face unrelated" to the arbitrable contract claims, it must be heard by this Court. *Genesco,* 815 F.2d at 856. As noted above, however, the subject statements involve the incidents that transpired as a result of the contractual relationships of the parties. *McMahon v. RMS Electronics, Inc.,* 618 F.Supp. 189, 192 (S.D.N.Y.1985), provides some guidance regarding these claims. That case involved termination of an employment contract, and assertion of allegedly unrelated defamation claims. There, as here, "the alleged defamatory statements [were] integrally linked to the contractual relationship between the parties."[5]

The Court finds that the tort claims of Counts III, V and VI are within the scope of the arbitration agreements, and those agreements require arbitration of the claims.

### D. Counts IV, VII and IX: 1933 Act Claims.

■ Arbitration of the claims based on alleged violations of the Securities and Ex-

---

**5.** A contrary result was reached in *Coudert v. Paine Webber Jackson & Curtis,* 705 F.2d 78 (2d Cir.1983). That case explicitly turned, however, on the fact that the statements occurred *after* the termination of the contractual relationship that included the arbitration provision. The present alleged torts, as noted above, occurred in the context of the parties' contractual relationship; *Coudert* is not applicable. *See, RMS Electronics, Inc.,* 618 F.Supp. at 192 (distinguishing *Coudert* on basis of "no clear nexus" between defamatory statements and contractual relationship).

change Act of 1933 (" '33 Act") present the most troublesome issues presently before the Court. The case law is in a state of obvious evolution, but the present law is clear in what it mandates. This Court must follow the binding, unambiguous authority and hold the '33 Act claims nonarbitrable, regardless of any agreements between the parties.

The controlling precedent here is *Chang v. Lin*, 824 F.2d 219, 222 (2d Cir.1987): "A plaintiff has the right to litigate a '33 Act claim in a federal court notwithstanding any arbitration agreement with the defendant." This is the latest statement of the law in this Circuit, incorporating the relevant Supreme Court decisions.

*Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953) held that the Congressional policy behind the '33 Act of "protect[ing] the rights of investors" was "better carried out by holding invalid such an agreement for arbitration of issues arising under the ['33] Act." *Id.* at 438, 74 S.Ct. at 188. The implicit underpinning of that determination was that arbitration mechanisms did not adequately safeguard the rights deemed paramount by Congress. The case law that developed in the wake of *Wilko* found those same policies to underlie the Securities and Exchange Act of 1934 (" '34 Act"), and to similarly hold claims under that Act non-arbitrable. *See, e.g., McMahon v. Shearson/American Express, Inc.*, 788 F.2d 94, 96–98 (2d Cir.1986), *rev'd,* 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987); *Allegaert v. Perot*, 548 F.2d 432 (2d Cir.1977), *cert. denied,* 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1084 (1977).

On the appeal of *McMahon, supra,* the Supreme Court reversed the Second Circuit's extension of *Wilko* to claims under § 10(b) of the '34 Act. *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). In so doing, it questioned the rationale underlying *Wilko,* but did not overrule *Wilko's* prohibition against waiving, through agreements to arbitrate, a judicial forum for claims under the '33 Act. *Chang,* 824 F.2d at 222. *Wilko* has not been overruled by the Supreme Court, and the Second Cir-

cuit has clearly held that *Wilko* "continues to govern us." *Id.*

The defendants nevertheless raise several arguments supporting their contention that the '33 Act claims must be arbitrated. Bear Stearns discusses the arbitration provisions of the agreements and exchange rule-contracts, and argues for their application. This misses the thrust of *Chang.* It is not that the agreements do not require arbitration, or do not encompass the '33 Act claims. The point is that the claims are not arbitrable because of a controlling judicial determination of a Congressional intention to so constrain such claims. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628, 105 S.Ct. 3346, 3354–55, 87 L.Ed.2d 444 (1985); *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 845 (2d Cir.1987).

Bear Stearns makes additional assertions regarding arbitration of the '33 Act claims. It contends that those claims are restated contract claims and are "not 1933 Act claims at all." Additionally, defendants ask that this Court disregard the law in this Circuit as expressed in *Chang,* and hold the claims arbitrable. Defendants' Memorandum of Law in Support of Motion to Stay Pending Arbitration and for Sanctions ("Defendants' Mem., Motion to Stay"), pp. 27–29.

Unlike the related tort claims held arbitrable above, the implication of contractual rights and responsibilities is not determinative here. The '33 Act claims involve judicial determinations of Congressional constraints external to the parties' agreement. While merely tossing in conclusory allegations to create the appearance of nonarbitrable claims will not bar arbitration, *cf. Coenen v. R.W. Pressprich & Co.*, 453 F.2d 1209 (2d Cir.1972), *cert. denied,* 406 U.S. 949, 92 S.Ct. 2045, 32 L.Ed.2d 337 (1972), real claims based on violations of the '33 Act are not, under current law in this Circuit, arbitrable. This is true even though there is a contractual relationship between the parties. Actions that constitute contract breach can, of course, also constitute securities law violations.

In Count IV, plaintiffs allege that defendants, in addition to the actions constituting breach noted above, knowingly and incorrectly mispriced "short puts" and other options,[6] made intentional misrepresentations about plaintiffs' accounts and their correct margin maintenance requirements, effected unauthorized short sales and other transactions in the account maintained for Pompano, and, again based on misrepresentations, compelled Pompano to purchase large numbers of securities. Complaint ¶¶ 67–72. These actions are said to constitute a series of violations of § 12(2) of the '33 Act.

In Count VIII, plaintiffs allege that defendants played a role in the issuance and distribution of put and call options in plaintiffs' account: and, in so doing, caused securities to be carried in interstate commerce for the purpose of sale or delivery after sale. They assert that these securities were not accompanied by a prospectus, which violated § 12(1) of the '33 Act. Complaint ¶¶ 90–94.

Plaintiffs allege in Count IX that the conduct of defendants constituted an offer or sale of a security in violation of § 17(a) of the '33 Act. The Court finds that, for present purposes, the '33 Act claims must be decided by this Court. *Chang*, 824 F.2d at 222.

Bear Stearns finally urges that this Court disregard *Chang*, arguing that the applicable portions are *dicta*, and that it will surely be overturned. Neither argument is persuasive. Defendants claim that because, prior to *McMahon's* disposition in the Supreme Court, the parties "agreed" that *Wilko* controlled, the *Chang* decision should have no force. During the pendency of the *Chang* appeal, *McMahon*, 107 S.Ct. 2332, was decided. The Second Circuit thus felt that it "must ... address plaintiffs' contention that the district court erred in staying their '33 Act claims pending arbitration of their state law claims." *Chang*, 824 F.2d at 222. The Circuit

Court's determinations regarding those claims are binding upon this Court.

It is true that the theoretical underpinning of *Wilko*, namely an implicit determination of Congressional disfavor of arbitration in the securities area and in '33 Act claims in particular, has been seriously eroded. *See, e.g., Rodriguez de Quijas v. Shearson/Lehman Brothers, Inc.*, 845 F.2d 1296, 1299 (5th Cir.1988); *Staiman v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 673 F.Supp. 1009, 1011 (C.D.Cal.1987). As stated before, however, whatever the trends may be in this rapidly evolving area of the law, the current mandates in this Circuit are clear. The '33 Act claims are not arbitrable.

*E. 1934 Act Claims.*

■ *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), quite clearly held that "agreements to arbitrate Exchange Act [of 1934] claims 'enforce[able] ... in accord with the explicit provisions of the Arbitration Act.'" *Id.* 107 S.Ct. at 2343 (quoting *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 520, 94 S.Ct. 2449, 2457, 41 L.Ed.2d 270 (1974)). The question regarding these claims is, then, whether the scope of the parties' agreements encompass the '34 Act claims.

As noted above, there are two sets of agreements including arbitration provisions. A general Customer Agreement of the type executed by all customers of Bear Stearns was signed by the plaintiffs, and additional Options Agreements were entered into. Plaintiffs allege that these Options Agreements were executed only after Lawrence made it known that he intended to trade options, individually and through his companies. Lawrence asserts that at the time the Options Agreements were entered into, Bear Stearns "took the position" that the general Customer Agreements did not govern option accounts and option trading. Lawrence Affidavit ¶¶ 5, 6. These assertions are disputed by Bear Stearns.

---

6. Short puts are options to buy a security at a fixed price during a specific period of time, as to which the put seller does not own the underlying security which he will be called upon to deliver if the option is subsequently exercised.

Defendants' Reply Memorandum of Law in Support of Motion to Stay Pending Arbitration and for Sanctions ("Defendants' Reply Mem., Motion to Stay"), p. 16.

The significance of these arguments lies in the plaintiffs' contention that the Options Agreement clauses do not constitute agreements to arbitrate '34 Act claims. The more general language of the Customer Agreements does not specifically exclude securities law claims, nor do the general provisions of the exchange rules. Plaintiffs apparently concede, and this Court agrees, that those agreements standing alone would be sufficient to require arbitration of the securities law claims. It must therefore be determined whether the arbitration provision of the Options Agreement supercedes, or is materially different from, the other arbitration provisions. For the reasons stated below, the Court concludes that the arbitration clause of the Options Agreements do not supercede the other contractual relations of the parties, and do not negate the contractual agreement to arbitrate the '34 Act claims embodied in the Customer Agreements.

Plaintiffs argue that the Options Agreements represent specific agreements that, under settled principles of contract law, supercede the more "general" arbitration provisions of the Customer Agreements. *Netherlands Curacao Co., N.V. v. Kenton Corp.*, 366 F.Supp. 744, 747 (S.D.N.Y.1973). Bear Stearns responds that the Customer Agreements, which apply to all "purchases and sales of securities and other property," by their terms apply to option trading. This would undoubtedly be true in the absence of any Options Agreements. The Options Agreements are not superfluous, however; where they "specifically amend" the Customer Agreements they are controlling. *See, e.g.*, Callahan Affidavit, Exh. C ¶ 7. In other respects, however, they are expressly "supplementary" and do not alter the terms of the Customer Agreements. The issue, then, is whether the arbitration provisions of the Options Agreements specifically amend the Customer Agreement clauses.

*Creative Securities Corp. v. Bear Stearns & Co.*, 671 F.Supp. 961 (S.D.N.Y. 1987), *aff'd* 847 F.2d 834 (2d Cir.1988) is helpful in this regard. That case turned on the interaction between an arbitration provision identical to the present Options Agreements clauses, and more general exchange rule arbitration requirements that did not exclude arbitration of securities claims. On the exclusionary language of those arbitration provisions, the Court commented:

> The Court interprets this language to provide only that the Customer Agreement [identical to the Option Agreement here] itself does not waive a customer's right to sue for securities violations in federal court, not necessarily to grant a right to bring a federal securities action. Thus, *if a customer is otherwise contractually obligated to arbitrate federal securities claims* (such as being bound to the rules of a self-regulatory organization), *the Customer Agreement will not stand as a bar to arbitration.*

*Id.* at 967–68 (emphasis added). As noted above, the Court finds that the present Customer Agreements bind the plaintiffs to arbitration of '34 Act claims. Here, as in *Creative Securities*, the supplementary provisions of the Options Agreements do not substantively bar arbitration that is otherwise contractually agreed to by the parties.[7]

Plaintiffs further argue that the arbitration provisions are "inconsistent," and, under general principles of contract law, indicate that the parties had no meeting of the minds. Plaintiffs' Memorandum of Law in Opposition to Motion To Stay Pending Arbitration and For Sanctions ("Plaintiffs' Mem., Motion to Stay"), at p. 14. They thus urge that the arbitration provisions cancel each other out entirely. *See, e.g., Lea Tai Textile Co. v. Manning Fabrics, Inc.*, 411 F.Supp. 1404 (S.D.N.Y.1975). As noted above, the Options Agreements are

---

**7.** Additionally, as in *Creative Securities,* there is a regulatory organization rule that requires arbitration of securities claims. Here that provision is found in the constitution of the AMEX, which binds the plaintiffs East Wind and Lawrence. *See* Part 1.B. above.

supplementary where they are not controlling, and there is no "inconsistency." The claims under the '34 Act are arbitrable.

### F. Count VII: Constitutional Claim.

■ Count VII of the Complaint alleges an unconstitutional taking under the Fifth Amendment. Defendants urge that this claim is a contract claim, merely denominated a constitutional claim. *See, Goldberg v. Donaldson, Lufkin & Jenrette Securities Corp.*, 650 F.Supp. 222, 228 (N.D.Ga.1986). The Court does not now determine the sufficiency of the constitutional claim, but notes that "the resolution of statutory or constitutional issues is a primary responsibility of courts," *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 57, 94 S.Ct. 1011, 1024, 39 L.Ed.2d 147 (1974). To the extent that there are constitutional issues, they will be addressed by this Court.

### G. Count XI: RICO Claim.

■ Little discussion need be devoted to the arbitrability of plaintiffs' RICO claims. *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 107 U.S. 2332, 2343–46, 96 L.Ed.2d 185 (1987) extensively explored Congressional policies and intent behind the RICO statute, and concluded that the claims there asserted were arbitrable. Plaintiffs here rely on pre-*McMahon* cases and assert that RICO claims should not be arbitrable if the predicate offenses were non-arbitrable, and further claim that they did not agree to arbitrate RICO claims. *McMahon* is dispositive of the arbitrability of the RICO claims in the abstract, and the specific claims here arise out of the contractual relationships of the parties, and are within the scope of the agreements to arbitrate. The RICO claims in Count XI are arbitrable.

### 3. Independent Objections to Arbitration Generally.

■ In addition to the specific arguments regarding the various claims just discussed, plaintiffs raise independent objections to arbitration itself.[8] One of these objections was noted and rejected above, namely the claim that inconsistent contractual provisions meant no contractual duty to arbitrate at all.

Plaintiffs point to choice of law clauses in the relevant contracts requiring application of New York law as defeating arbitration pursuant to those same agreements. This argument is without merit. Plaintiffs cite *Laurence v. Corwin*, 75 A.D.2d 840, 427 N.Y.S.2d 865 (2d Dept.1980), a pre-*McMahon* state court case refusing to compel arbitration of common law claims coupled with securities law claims, as evidence of the New York law incorporated by the choice clause.

Once the contractual duties are established, arbitrability of various individual claims is a question of federal law, which in large part was determined by *McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). *See also, Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). The choice of New York law, or a choice of law provision generally, does not affect the validity of the arbitration clauses. *Cf., Patten Securities Corp., Inc. v. Diamond Greyhound & Genetics Inc.*, 819 F.2d 400, 407 (3d Cir.1987) (choice of forum clause not affecting arbitrability).

The last objection to arbitration raised by plaintiffs is one of implied bias in the arbitration process itself. This "bias" argument occurs in two contexts; as an objection generally to arbitration of all claims, and as the harm requirement supporting plaintiffs' motion for a preliminary injunction staying arbitration. *See*, respectively, Plaintiffs' Mem., Motion to Stay at p. 11; Plaintiffs' Reply Memorandum in Support of Motion for Preliminary Injunction Pendente Lite Against Bear Stearns Defendants ("Plaintiffs' Reply Mem., Prelim. Inj.") pp. 7 *et seq.*

---

**8.** Count XII of the Second Amended Complaint seeks a declaratory judgment under 28 U.S.C. §§ 2201, 2202 that the other claims of the complaint are not arbitrable, for essentially the reasons discussed here and below. As such, it is essentially a reformulation of the motions presently before the Court.

**516**

4. Bias in the Contemplated Arbitration.

■ Plaintiffs argue that bias will inevitably exist with regard to any arbitration between the present parties. The arbitration that defendants have sought to initiate is before the defendant NASD. Plaintiffs were compelled to select from among several possible forums, and selected the NASD under protest and without conceding any issues of arbitrability. *See*, Affidavit of Stephen Ratner, Esq. sworn to on February 29, 1988 ("Ratner Affidavit"), and Exhibits 1–9 attached thereto. This selection was made prior to the amendment of the complaint which added NASD as a defendant.

Defendant Options Clearing Corporation ("OCC") is an incorporated trade association whose "participating organizations" include defendant NASD and other exchange organization defendants to this action. Plaintiffs allege that those organizations are controlling persons of the OCC within the meaning of § 20 of the '34 Act and § 15 of the '33 Act. As such, these participating organizations would allegedly be jointly and severally liable with the OCC for violations of those Acts.[9] Additionally, separate indemnification and collection agreements running in favor of the OCC against its participating organizations and clearing members (which includes Bear Stearns) are said to exist. Affidavit of Joel Brenner, Esq., sworn to on March 28, 1988 ("Brenner Affidavit"), ¶ 4, and Exhibit E attached thereto. These agreements are said to further the identification of interests of the defendants OCC, Bear Stearns, and NASD. Finally, the exchange organization defendants are said to have played a direct role in the dispute between plaintiffs and Bear Stearns, in that organization rules and supervisory functions were implicated.

Section 10(b) of the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, provides that an arbitral award shall not be valid in the case of "evident partiality ... in the arbitrators." In interpreting this standard, the

Second Circuit requires "a showing of something more than the mere 'appearance of bias' to vacate an arbitration award." *Morelite Const. Corp. v. N.Y.C. Dist. Council Carpenters*, 748 F.2d 79, 83–84 (2d Cir.1984). This showing can be met by "inferences from objective facts inconsistent with partiality." *Pitta v. Hotel Ass'n of New York City, Inc.*, 806 F.2d 419, 423 (2d Cir.1986). Pecuniary and institutional interests can, of course, disqualify a decision-maker. *N.Y. State Inspection v. N.Y. State Public Employment Relations Board*, 629 F.Supp. 33, 40 (N.D.N.Y.1984) (citing *Schweiker v. McClure*, 456 U.S. 188, 195, 102 S.Ct. 1665, 1670, 72 L.Ed.2d 1 (1982); *Wolkenstein v. Reville*, 694 F.2d 35, 41 (2d Cir.1982), *cert. denied*, 462 U.S. 1105, 103 S.Ct. 2452, 77 L.Ed.2d 1332 (1983)). "Proof" of actual bias, however, is not required. *Morelite*, 748 F.2d at 84.

This Court has elaborated on the standards set out above, and identified three factors that are relevant in evaluating whether a particular relationship creates an impermissible bias:

(1) the financial interest the arbitrator has in the proceeding; (2) the directness of the alleged relationship between the arbitrator and a party to the arbitration proceeding; (3) and the timing of the relationship with respect to the arbitration proceeding.

*Sanford Home For Adults v. Local 6, IFHP*, 665 F.Supp. 312, 320 (S.D.N.Y.1987). To set aside an arbitration award the showing of "bias of the arbitrator [must be] direct and definite; mere speculation is not enough." *Sofia Shipping Co. v. Amoco Transport Co.*, 628 F.Supp. 116, 119 (S.D.N.Y.1986). *See also, Konkar Maritime Enterprises v. Compagnie Belge D'Affretement*, 668 F.Supp. 267, 272 (S.D.N.Y. 1987).

Here there is no arbitration award to be set aside; the arbitration is sought to be prospectively invalidated before it occurs. The above standards are instructive, however, and turning to their application it is immediately apparent that all of plaintiffs'

---

**9.** Plaintiffs also allege interlocking directorships between the OCC and the various exchange and Bear Stearns defendants. Plaintiffs' Reply

Mem., Prelim. Inj., p. 5; Brenner Affidavit, Exh. D.

objections go to the impartiality of the *forum*, not of the *arbitrators*. Plaintiffs' arguments largely involve the applicable arbitration rules and procedures. These provisions provide that the forum organization oversees the appointment of arbitrators, ultimately pays the arbitrators, and has possible opportunities for contact with the arbitrators through its staff attorney.

Plaintiffs' argument, then, is essentially that because the *forum* is asserted to be biased, it will further its bias by the appointment of biased arbitrators, it will ensure arbitrator conformity to its biased views through its payment of the arbitrators, and will further act on its bias by improperly influencing the arbitrators in *ex parte* communications through its staff attorney. For the following reasons, the Court finds that plaintiffs' claims of bias are too speculative and attenuated to justify invalidation of all contemplated arbitration, or to enjoin it before it commences. *See* Part 5 below.

Initially, it is far from clear that the forum for arbitration of the instant claims would necessarily be tainted. The claims to be arbitrated involve only Bear Stearns and the plaintiffs. The identity of financial interests that plaintiffs urge do not implicate the interests of any of the industry defendants; the indemnity agreements upon which plaintiffs rely run *in favor* of those defendants. Complete recovery in arbitration by either Bear Stearns or the plaintiffs would not have any direct financial effect on the OCC, the NASD, or any other exchange defendant.[10]

Plaintiffs additionally argue that their allegations of "industry-wide fraud" create impermissible bias. *See, e.g.,* Plaintiffs' Mem. in Further Support, Prelim. Inj., p. 6. They cite *Allegaert v. Perot*, 548 F.2d 432 (2d Cir.), *cert. denied*, 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1084 (1977), in support of this proposition. There the Second Circuit held certain bankruptcy and securities claims non-arbitrable, and noted that

the "claim of wholesale fraud of institutional dimension, especially when raised by a trustee," did not constitute an exception to the contemporary *Wilko* rule against arbitration of all securities claims.

*Allegaert* is not applicable to the present bias allegations. The arbitration provisions at issue in *Allegaert* were contained in exchange organization rules that would have clearly bound the bankrupt corporation. The plaintiff bankruptcy trustee claimed, as a separate entity, that it was not bound under the provisions. This "lack of identity [was] particularly important" in the Court's determination. *Id.* at 436. Additionally, the case was decided a decade ago, before *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). In holding the securities and bankruptcy law claims non-arbitrable, the decision reflected an earlier stage in the evolving judicial attitudes toward arbitration. For example, the *Allegaert* Court stated that the trustees' claims were not arbitrable in part "for reasons similar to those why an antitrust claim should not ordinarily be arbitrable." *Allegaert*, 548 F.2d at 437. The absolute exclusion of antitrust claims is no longer the law. *McMahon*, 107 S.Ct. at 2340; *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 105 S.Ct. 3346, 3355, 87 L.Ed.2d 444 (1985).

Plaintiffs here do seek to implicate serious concerns that go to the fundamental workings of the securities markets, and allege that official SEC findings support their position. Plaintiffs' Reply Mem., Prelim. Inj. p. 22. The Court expresses no opinion about the validity or efficacy of those concerns, but must focus on the discrete dispute presented by this lawsuit. All of the parties implicated in the present motions are contractually bound to each other, members of the securities industry, and members of various self-regulatory bodies. The Court finds no overriding rea-

---

**10.** The Court notes that plaintiffs amended their complaint to add the NASD after the contemplated arbitration in that forum was initiated. The naming of an arbitrator as a defendant does not "automatically" create impermissable bias.

*Toyota of Berkeley v. Local 1095*, 834 F.2d 751, 757 (9th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 2036, 100 L.Ed.2d 620 (1988). Likewise, the naming of an arbitration forum cannot automatically disqualify the forum.

son to go against the "weighty presumption that arbitration is proper ... between members of self-regulatory organizations," *Creative Securities Corp. v. Bear Stearns,* 671 F.Supp. 961, 966–67 n. 9 (S.D.N.Y. 1987), *aff'd,* 847 F.2d 834 (2d Cir.1988), or to disregard the contractually and institutionally created commitments to arbitrate in a securities forum.

Even if it were established that the *forum* had some sort of interest in the outcome of the arbitration, the leap to the conclusion that the *arbitrators* would necessarily be biased is in the present case too tenuous. Section 22 of the NASD arbitration rules provide the parties with "unlimited challenges for cause" to the appointment of arbitrators. *See,* Exhibit B, attached to Brenner Affidavit. Those rules also require potential arbitrators to disclose interests which might affect their impartiality. Bias is the *sine qua non* of a "cause" challenge; there clearly are safeguards to ensure against appointment of arbitrators predisposed against the plaintiffs' position.

The fact that the forum may compensate the arbitrators is not itself sufficient to establish "evident partiality." The payment fees to arbitrators does not, of course, depend on their disposition of the merits. In *Pitta v. Hotel Ass'n of New York City, Inc.,* 806 F.2d 419 (2d Cir.1986), the Court found arbitration was biased where the dispute directly affected the arbitrators' own employment, but the Court did not "suggest that an arbitrator must recuse himself from every decision that might have any bearing on his compensation." *Id.* at 424. As defendants note, the typical reality of arbitration of this type involves arbitrators who often accept their appointment as a form of public service, and the fees they might receive do not make up for what they lose by taking time from their regular employment. *See,* Defendants' Memorandum of Law in Further Opposition to Plaintiffs' Motion for a Preliminary Injunction ("Defendants' Mem. in Further Opp., Prelim. Inj."), at p. 18. An

attack upon the mere payment of arbitrator fees is an attack upon arbitration itself, and as such the Court finds it without merit.

Similarly, the plaintiffs' assertion of inevitable bias through possible opportunity for *"ex parte"* contact between the NASD staff attorney and the arbitrators is attenuated and speculative. Plaintiffs have not established that such contact necessarily occurs in all cases, would actually occur in the present case, or that it would be used by the allegedly partial forum to influence the outcome of the arbitration proceeding (which would thereby risk vacation of the arbitral award). While actual improper contact between a party to the arbitration (which the NASD is not) and an arbitrator would of course be impermissible, *New York State Inspection, etc. v. New York State Public Employment Relations Board,* 629 F.Supp. 33 (N.D.N.Y.1984), the speculative, hypothetical assertions that plaintiffs make do not approach this situation.

Plaintiffs re-assert their claims of impermissible bias in several ways, claiming a constitutional right to an impartial forum, and that they did not "agree" to arbitrate in a biased forum. Plaintiffs' Reply Mem., Prelim. Inj., pp. 16–23; *Withrow v. Larkin,* 421 U.S. 35, 46, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975). While both propositions may undoubtedly be true in the abstract, the predicate showing of evident partiality has not been made. For the foregoing reasons, the Court finds that the arbitration contemplated here does not indicate evident partiality sufficient to block all arbitration. *Cf. Morelite Const. Corp. v. N.Y.C. Dist. Council Carpenters,* 748 F.2d 79 (2d Cir.1984); *Sanford Home For Adults v. Local 6, IFHP,* 665 F.Supp. 312 (S.D.N.Y.1987).

5. Preliminary Injunction.

■ The above findings of fact and conclusions of law are largely dispositive of the plaintiffs' motion to enjoin arbitration of all claims.[11] A preliminary injunction

---

11. Subsequent to the submission of the instant motions, plaintiffs substituted counsel. Plain-

tiffs' current counsel offered by letter to withdraw the motion for a preliminary injunction

pursuant to Fed.R.Civ.P. 65 may only issue:

> when the moving party has shown (a) irreparable harm; and (b) either (i) a liklihood of success on the merits, or (ii) sufficiently serious questions going to the merits to be a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Inverness Corporation v. Whitehall Laboraties*, 819 F.2d 48, 50 (2d Cir.1987). Plaintiffs claim to show three distinct forms of irreparable harm: (1) deprivation of a fair forum, (2) application of a differing standard of review on appeal, and (3) forced submission of non-arbitrable claims to arbitration. Plaintiffs' Mem. in Further Support, Prelim. Inj., pp. 8–9.

The implicit underpinning of all of these claimed harms is the assumption that the arbitration will necessarily be unfair. As indicated above, the Court does not now make that determination. Plaintiffs have not shown irreparable harm; this Court will therefore not grant injunctive relief.[12]

Even if the eventual arbitration turned out to be unfair, any resultant injury would not be "irreparable." If the arbitration were in fact biased, plaintiffs could challenge that award and, if successful, it will

have no effect. If there were no bias, the award will properly receive the effect to which it is entitled by law. The possible expense incurred in defending an arbitration is not, of course, irreparable harm. *See, e.g., Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914, 917 (2d Cir.1986) ("It is well established that 'irreparable injury means injury for which a monetary award cannot be adequate compensation.'"), citing *Jackson Dairy Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979); *Broadcast Arts Prod. Inc. v. Screen Actors Guild*, 673 F.Supp. 701, 708 (S.D.N.Y.1987) (arbitration in a forum not chosen for dispute resolution not irreparable harm).

Plaintiffs' claim of irreparable harm based on differing standards of review is inapposite. The standard of review on the merits has no bearing on a bias challenge to the validity of the award. Again, this alleged harm rests on an assumption that the Court does not make, namely that the arbitration will necessarily be biased.

Finally, plaintiffs will not be forced to arbitrate non-arbitrable claims.[13] The above discussion involves determinations of the arbitrability of the various claims; plaintiffs will not be compelled to arbitrate claims whose arbitrability has not been de-

*without* prejudice; that application was opposed by defendants. The findings of fact and conclusions of law above are requisite both to the decision on a preliminary injunction, Fed.R.Civ. P. 52(a), and for the motion to stay. *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 844 (2d Cir.1987). The preliminary injunction motion is here decided, and denied.

**12.** Defendants urge that this Court has no authority under 9 U.S.C. § 10(b) to halt arbitration because of alleged bias before it commences. *Cf., Michaels v. Mariforum Shipping S.A.*, 624 F.2d 411, 414 n. 4 (2d Cir.1980); *Marc Rich & Co. v. Transmarine Seaways Corp.*, 443 F.Supp. 386, 388 (S.D.N.Y.1978); *Petition of Dover Steamship Company*, 143 F.Supp. 738, 742 (S.D. N.Y.1956). They further assert that clear policy concerns counsel against such interference. *Hunt v. Mobil Oil Corp.*, 654 F.Supp. 1487, 1498 (S.D.N.Y.1987).

Plaintiffs respond that the equitable power of this Court allows injunction of arbitration for bias before the determination of arbitrability.

Plaintiffs' Memorandum of Law in Further Support for Preliminary Injunction Pendente Lite ("Plaintiffs' Mem. in Further Support, Prelim. Inj."), p. 4.

For present purposes, it need only be noted that the arbitrability issues are decided. *See* Part 2 above. Additionally, as indicated here and below, plaintiffs have not sufficiently shown bias to invalidate arbitration of all claims, or to support a preliminary injunction. The Court therefore does not enjoin arbitration, and does not need to decide what the basis of its authority to do so would be. Any such determination would in any event be *dictum*.

**13.** Plaintiffs claim that under Fed.R.Civ.P. 13(a) the claims by Bear Stearns are compulsory counterclaims that must be asserted in this proceeding. Plaintiffs' Reply Mem., Prelim. Inj., p. 24. That same argument was made and rejected by this Court in *Calloway v. Marvel Entertainment, Div. of Cadence Ind.*, 564 F.Supp. 107, 108 (S.D.N.Y.1983). This conclusion is consistent with the mandates of *Dean Witter*, 470 U.S. at 218, 105 S.Ct. at 1240.

cided. To the extent that plaintiffs object to the possible overlap of arbitration and litigation, the Court would only note that *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 221–23, 105 S.Ct. 1238, 1242–44, 84 L.Ed.2d 158 (1985) indicates that such concerns are not determinative.[14]

### 6. Motion to Stay.

■ As the above discussion indicates, certain of the present claims will go forward in this Court, and others are arbitrable pursuant to the parties' agreements. The Court must therefore decide whether to stay the balance of the proceeding. The concurring opinion of Justice White in *Dean Witter Reynolds v. Byrd,* 470 U.S. 213, 225, 105 S.Ct. 1238, 1245, 84 L.Ed.2d 158 (1985) (White, J. concurring) is instructive:

> [O]nce it is decided that [litigation of federal securities claims and arbitration of pendent state claims] are to go forward independently, the concern for speedy resolution suggests that neither should be delayed. While the impossibility of the lawyers being in two places at once may require some accommodation in scheduling, ... the heavy presumption should be that the arbitration and the lawsuit will each proceed in its normal course.

Quoted in *Chang v. Lin,* 824 F.2d 219, 223 (2d Cir.1987). While broad stay orders may be appropriate where the nonarbitrable claims are of questionable merit or the arbitrable claims predominate, *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.,* 815 F.2d 840, 856 (2d Cir.1987), the decision to stay is one traditionally left to the discretion of the court. *Chang,* 824 F.2d at 222; *Genesco,* 815 F.2d at 856; *NPS Communica-*

*tions, Inc. v. Continental Group, Inc.,* 760 F.2d 463, 466 (2d Cir.1985).

Here, as in *Chang,* the "heavy presumption" against deferral of non-arbitrable claims is not rebutted. There are no "compelling reasons" to stay the litigation; the non-arbitrable claims will proceed in this Court.

Defendants not only moved to stay these proceedings, but also moved for sanctions under Fed.R.Civ.P. 11, asserting that the Complaint stated "clearly" arbitrable claims and was thus sanctionable. As noted above, several of those claims are not, in fact, arbitrable. Defendants' present motion for sanctions is denied.

### CONCLUSION

Plaintiffs' motion for a preliminary injunction is denied. Defendants' motions for a stay of these proceedings and for sanctions are denied. Additionally, plaintiffs' motion to strike a supporting affidavit is denied, as is defendants' responding motion for sanctions. The action will proceed in this Court consistent with the opinion above. Counsel for the parties are ordered to appear in Courtroom 36 on November 9, 1988 at 4:30 p.m. for a pre-trial conference.

SO ORDERED.

---

**14.** Plaintiffs suggest that possible collateral estoppel concerns may also constitute irreparable harm, citing *Greenblatt v. Drexel Burnham Lambert, Inc.,* 763 F.2d 1352 (11th Cir.1985). Plaintiffs Reply Mem., Prelim Inj., pp. 11–13. The collateral estoppel effects of an arbitration award depend upon a variety of factors, including what issues are actually litigated and decided, how such issues are reflected in the award, the identity of the parties in the later proceedings, and the discretion of the judges and arbitrators who are later asked to give preclusive effect to the award. Such speculative endeavors will not serve as a basis for injunctive relief. *Dean Witter,* 470 U.S. at 223, 105 S.Ct. at 1244 ("The collateral-estoppel effect of an arbitration proceeding is at issue only after arbitration is completed, of course ...").